Nos. 22-1435, 22-1771

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

———————————

MONTEREY RESEARCH, LLC,

*Appellant,*

v.

STMICROELECTRONICS, INC.,[1]

*Appellee.*

———————————

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board, *Inter Partes Review* Nos. 2020-00985, 2021-00355, 2020-01492, and 2021-00702

———————————

## [CORRECTED] BRIEF OF APPELLANT
## MONTEREY RESEARCH, LLC

———————————

Kayvan B. Noroozi
NOROOZI PC
11601 Wilshire Blvd., Suite 2170
Los Angeles, CA 90025
Telephone: (310) 975-7074
Facsimile: (844) 975-7074

*Counsel for Appellant*

---

[1] Appellant's use of this Court's official caption does not concede that STMicroelectronics, Inc. ("STMicro") is a proper party to Appeal 22-1771. *See* Section IV, *infra*.

**PATENT CLAIMS AT ISSUE**

In IPR2020-00985, STMicroelectronics, Inc. ("STMicro") challenged claims 1-21 of the '134 patent. Appx1. In IPR2020-01492, Qualcomm Inc. ("Qualcomm") challenged claims 1-7 and 9-21, but not claim 8. Appx35.

Claim 1 recites:

1.    A circuit comprising:

a memory comprising a plurality of storage elements each configured to read and write data in response to an internal address signal; and

a logic circuit configured to generate a predetermined number of said internal address signals in response to (i) an external address signal, (ii) a clock signal and (iii) one or more control signals, wherein said generation of said predetermined number of internal address signals is non-interruptible.

Independent claims 16 and 17 recite similar limitations. Appx6. The remaining challenged claims depend from claims 1, 16, and 17. *Id.*

i

## CERTIFICATE OF INTEREST

Counsel for Monterey Research, LLC certifies the following:

1.      The full name of every party represented by me is: Monterey Research, LLC.

2.      The name of the real party in interest represented by me is: IPValue Management, Inc.

3.      The full names of all parent corporations for the entities and all publicly held companies that own 10 percent or more of the stock of the party represented by me is: IPValue Management, Inc.

4.      The names of all law firms and the partners or associates who appeared for Appellant before the United States Patent and Trademark Office, or are expected to appear in this Court (and who have not or will not enter an appearance in this case), are: Theodoros Konstantakopoulos, Ph.D., Michael A. Wueste, Jonas R. McDavit, Ryan G. Thorne, and Jordan N. Malz of Desmarais LLP.

5.      The following cases could affect or be affected by this appeal: *Monterey Research, LLC v. STMicroelectronics N.V.*, No. 1:20-cv-00089-NIQA-LAS (D. Del.).

6.    Counsel has no information to provide pursuant to Rule 47.4(a)(6) and 26.1(b) and (c) as this is not a criminal or bankruptcy case.

Dated:  September 19, 2022         By:              */s/ Kayvan B. Noroozi*
                                                     Kayvan B. Noroozi

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 1

JURISDICTIONAL STATEMENT ................................................................... 4

STATEMENT OF THE ISSUES........................................................................ 5

STATEMENT OF THE CASE .......................................................................... 6

    A.    The '134 Patent ...................................................................... 6

    B.    The challenged claims............................................................ 9

    C.    The -985 IPR proceeding .................................................... 10

    D.    The -1492 IPR proceeding .................................................. 15

SUMMARY OF THE ARGUMENT ................................................................. 17

ARGUMENT................................................................................................ 22

STANDARD OF REVIEW ............................................................................. 22

I.    The Board's finding that the combination of Wada and Barrett meets "a predetermined number of internal address signals" impermissibly relies on a new theory, and nonetheless lacks substantial evidence ........... 23

    A.    The challenged claims require "generating a *predetermined* number of [ ] internal address signals" ............................ 23

    B.    To meet the limitation, the Petition presented two theories based on Wada alone, which Appellant demonstrated to be incorrect ............................................................................... 25

    C.    The Board's decision improperly relied on a new theory of its own creation, and nonetheless lacks substantial evidence................ 27

II.    The Board's conclusion that the "non-interruptible" limitation was obvious in view of Wada modified by Barrett is not supported by substantial evidence as a matter of law ....................................... 35

    A.    All challenged claims require "non-interruptible" internal address signal generation ................................................... 35

    B.    The Petition sought to meet that limitation based on Wada alone and in combination with Barrett, but failed as to both theories................................................................................. 35

    C.    The Board nonetheless found the limitation obvious based on Wada modified in view of Barrett, without substantial evidence to support its conclusion of obviousness as a matter of law .............. 37

III.  The Board's conclusion of anticipation based on Schaefer is directly contradicted by Schaefer's extensive teachings, and is erroneous ............... 51

    A.  The Board's decision rests on finding that AUTO-PRECHARGE renders Schaefer's *entire* burst non-interruptible ...... 51

    B.  The Board's decision is erroneous because Schaefer's own teachings and the evidence contradict the Board's assumptions ....... 56

IV.  STMicro was not a party to IPR2020-01492, is not a party to Appeal No. 22-1771, and may not appear as appellee in that appeal ...................... 63

CONCLUSION ...................................................................................................... 65

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
  544 F.3d 1341 (Fed. Cir. 2008).................................................. 2, 19, 44

*ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012).................................................. passim

*Applications in Internet Time, LLC v. RPX Corp.*,
  897 F.3d 1336 (Fed. Cir. 2018).................................................. 22, 62

*Arctic Cat Inc. v. Bombardier Rec. Prods.*,
  876 F.3d 1350 (Fed. Cir. 2017)........................................................ 43

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
  381 F.3d 1371 (Fed. Cir. 2004)....................................................... 44

*Cypress Semiconductor Corp. v. GSI Tech., Inc.*,
  No. 13-cv-02013-JST, 2014 U.S. Dist. LEXIS 105363 (N.D. Cal. July 29, 2014)
  ................................................................................................ 23

*DSS Tech. Mgmt., Inc. v. Apple Inc.*,
  885 F.3d 1367 (Fed. Cir. 2018).................................................. 42, 47

*Endo Pharm., Inc. v. Actavis LLC*,
  922 F.3d 1365 (Fed. Cir. 2019)....................................................... 45

*Eurand, Inc. v. Mylan Pharms., Inc. (In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.)*,
  676 F.3d 1063 (Fed. Cir. 2012)....................................................... 45

*Graham v. John Deere Co.,*
  383 U.S. 1 (1966)............................................................................ 48

*In re Certain Static Random Access Memories and Products Containing Same*,
  337-TA-792, 2012 ITC LEXIS 2543 (Oct. 25, 2012) ...................... 23

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
  676 F.3d 1063 (Fed. Cir. 2012)....................................................... 43

*In re Kumar*,
  418 F.3d 1361 (Fed. Cir. 2005)....................................................... 46

v

*In re Magnum Oil Tools Int'l, Ltd.*,
  829 F.3d 1364 (Fed. Cir. 2016).................................................. passim
*In re Van Os*,
  844 F.3d 1359 (Fed. Cir. 2017).................................................. 42, 47
*Innogenetics, N.V., v. Abbott Labs.*,
  512 F.3d 1363 (Fed. Cir. 2008).................................................. 40
*Intelligent Bio–Sys., Inc. v. Illumina Cambridge Ltd.*,
  821 F.3d 1359 (Fed. Cir. 2016).................................................. 22, 43
*InTouch Techs., Inc. v. VGo Commc'ns, Inc.*,
  751 F.3d 1327 (Fed. Cir. 2014).................................................. 42, 47
*Intuitive Surgical, Inc. v. Ethicon LLC*,
  25 F.4th 1035 (Fed. Cir. 2022) ................................................. 63
*KEYnetik, Inc. v. Samsung Elecs. Co.*,
  841 F. App'x 219 (Fed. Cir. 2021) ............................................ 19, 43
*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
  688 F.3d 1342 (Fed. Cir. 2012).................................................. 43
*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007)....................................................... 19, 40, 42, 47
*Oren Techs., LLC v. Proppant Express Invs. LLC*,
  No. 2019-1778, 2021 U.S. App. LEXIS 21859 (Fed. Cir. July 23, 2021)... passim
*Otsuka Pharm, Co. v. Sandoz, Inc.*,
  678 F.3d 1280 (Fed. Cir. 2012).................................................. 48
*Owens Corning v. Fast Felt Corp.*,
  873 F.3d 896 (Fed. Cir. 2017).................................................. 22
*Raytheon Techs. Corp. v. GE*,
  993 F.3d 1374 (Fed. Cir. 2021).................................................. 19, 45
*Regeneron Pharm., Inc. v. Merus N.V.*,
  864 F.3d 1343 (Fed. Cir. 2017).................................................. 45
*TQ Delta, LLC v. Cisco Sys.*,

942 F.3d 1352 (Fed. Cir. 2019).................................................... passim

*Univ. of Strathclyde v. Clear-Vu Lighting LLC,*

   17 F.4th 155 (Fed. Cir. 2021) .................................................. passim

**Statutes**

28 U.S.C. § 1295 ............................................................................ 5

35 U.S.C. § 141 .............................................................................. 5

35 U.S.C. § 142 .............................................................................. 5

35 U.S.C. § 315 ........................................................................ 6, 64

35 U.S.C. § 319 ........................................................................ 5, 64

**Regulations**

37 C.F.R. 90.3................................................................................ 5

## STATEMENT OF RELATED CASES

The following cases could affect or be affected by this appeal:

*Monterey Research, LLC v. STMicroelectronics N.V.*, No. 1:20-cv-00089-NIQA-LAS (D. Del.).

**INTRODUCTION**

The Board's decisions of unpatentability below are contrary to this Court's precedents, and lack substantial evidence.

The Board may not "raise, address, and decide unpatentability theories never presented by the petitioner and not supported by the record evidence." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016). Yet the Board's decision below in IPR2020-00985 ("the -985 IPR") did exactly that. The Board repurposed Petitioner's obviousness modification theory as to the "non-interruptible" address signal generation limitation in order to meet the separate requirement of "generating a predetermined number of internal address signals," for which Petitioner had only relied on Wada alone, without modification. This Court has held that the Board's "repurposing" of theories in that manner is "reversible error." *Oren Techs., LLC v. Proppant Express Invs. LLC*, No. 2019-1778, 2021 U.S. App. LEXIS 21859, at *14-15 (Fed. Cir. July 23, 2021) (citing *In re Magnum*, 829 F.3d at 1381). It should reverse on that basis here.

The Board's new theory was also substantively erroneous. There is no dispute that "generating a *predetermined number* of internal address signals" requires generating a specific, fixed number of addresses determined prior to the generation. Wada's system does not generate any specific, "predetermined" number of address, but instead starts and stops address generation based on the

1

state of an external signal that may be changed at any time. Appx13 (finding that Wada generates addresses "***every time*** . . . the advance signal ADV is High"), Appx19 (finding that "if the ADV signal is not maintained in a high state throughout a burst, the circuit will ***not continue*** generating addresses for the burst.") (emphases added). The Board sought to solve that problem by modifying Wada in view of Barrett such that "a burst ***cannot be stopped once started***." Appx24 (emphasis added). But the Board's attempted fix only made the problem worse: a burst that cannot be stopped continues indefinitely, and cannot meet the requirement of a "predetermined number" of addresses. The Board's conclusion of obviousness based on its new theory thus lacks substantial evidence.

The Board's conclusion of obviousness as to the requirement of "*non-interruptible*" fixed length burst generation likewise lacks substantial evidence. The Board agreed that Wada's bursts can be stopped by an external signal, Appx19, and are thus *interruptible*. Appx10 ("a non-interruptible burst does not require the control signals be maintained in a particular state once a burst begins"). The Board nonetheless found the claims obvious in view of Wada, Appx21, modified by "the particular desire to prohibit interruptions within Wada's bursts." Appx22. But mere "knowledge of the goal does not render its achievement obvious." *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1352 (Fed. Cir. 2008). And the Board made no finding as to *how* Wada could have been modified, based on

the *prior art*, to "operate or read on the [challenged] claims" with a reasonable expectation of success, as this Court's precedents have repeatedly required. *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012). Instead, the Board relied on the disclosure of the '134 patent itself and testimony regarding that disclosure as evidence of obviousness, and concluded it did not "need[ ] to show additional detail regarding how to implement the asserted combination." Appx21. That was reversible error. "[T]he inventor's own path itself ***never*** leads to a conclusion of obviousness; that is hindsight." *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 162 (Fed. Cir. 2021) (emphasis added); *TQ Delta, LLC v. Cisco Sys.*, 942 F.3d 1352, 1362 (Fed. Cir. 2019).

The Board's conclusion of anticipation based on Schaefer in IPR2020-01492 also rests on evidence that cannot support its conclusion. It was undisputed that Schaefer's bursts can be interrupted. The only issue before the Board was whether Schaefer's optional AUTO-PRECHARGE feature created an exception to that rule and made bursts with AUTO-PRECHARGE "non-interruptible." Appx11-12. That dispute, in turn, centered on whether Schaefer's statement that "[t]he user is not allowed to issue another command until the precharge time ($t_{RP}$) is completed" prohibits "another command" beginning at time $t_6$, ***after*** burst generation has started (in which case Schaefer cannot anticipate), or ***at the same time*** that burst generation starts at time $t_2$, as Qualcomm argued. The Board's conclusion of

anticipation rested on its finding that "another command" necessarily referred back to the read or write command issued at the beginning of the burst. Appx12, Appx14. But Schaefer's own immediately surrounding text ties the triggering event to the "*AUTO-PRECHARGE command*"—*not* the read or write command. Appx4564 (7:40-47). And Schaefer expressly states, *twice*, that the AUTO-PRECHARGE command is issued *after* the burst begins, at *time $t_6$*. Appx4564 (8:65-9:1) ("*at time $t_6$* the AUTO-PRECHARGE command is internally performed"); Appx4565 (9:60-65) (identifying the "beginning of the . . . AUTO-PRECHARGE command [ ] at *time $t_6$*"). Schaefer likewise consistently states that the AUTO-PRECHARGE command comes "following" and "after" the read and write commands, not at the same time as those commands. Appx4561 (2:50-53), Appx4562 (4:53-56), Appx4563 (5:28-33), Appx4564-4565 (8:61-9:4), Appx4565 (9:16-22). The Board's finding that Schaefer's AUTO-PRECHARGE feature prevents burst interruptions from the start of the burst, at time $t_2$, is therefore clearly erroneous. Its conclusion of anticipation should thus be reversed.

STMicroelectronics, Inc., which is not a party to the 22-1771 appeal and was estopped from IPR2020-01492 below, Appx35, cannot argue otherwise.

## JURISDICTIONAL STATEMENT

This appeal arises from the Patent Trial and Appeal Board's Final Written Decisions in *Advanced Micro Devices, Inc. and STMicroelectronics, Inc. v.*

4

*Monterey Research, LLC*, IPR2020-00985, Paper 31 (Nov. 30, 2021), and

*Qualcomm Inc. v. Monterey Research, LLC*, IPR2020-01492, Paper 33 (March 4,

2022). Appx1 & Appx34. Pursuant to 37 C.F.R. 90.3(b)(1), 35 U.S.C. § 142, and

35 U.S.C. § 319, Monterey Research, LLC timely appealed. No. 22-1435, Dkt. 1;

22-1771, Dkt. 1. This Court has jurisdiction under 35 U.S.C. § 141(c) and 28

U.S.C. § 1295(a)(4).

## STATEMENT OF THE ISSUES

*As to Appeal No. 22-1435, arising from IPR2020-00985*:

I.      Whether the Board erroneously concluded that the combination of

Wada and Barrett renders "generating a predetermined number of internal address

signals" obvious where (a) the Board relied on a theory of its own creation and (b)

that theory failed to meet the requirement of generating a "*predetermined* number."

II.     Whether the Board erred in concluding that the "non-interruptible"

limitation was obvious over Wada modified in view of Barrett where the Board

made no finding as to *how* Wada's logic circuit could have been modified, with a

reasonable expectation of success, to arrive at the claimed invention, and instead

relied on the disclosure of the '134 patent itself to find obviousness.

*As to IPR2020-01492, underlying Appeal No. 22-1771*:

III.    Whether the Board's finding that Schaefer anticipates the challenged claims is erroneous where that finding rests on a textual interpretation of Schaefer that cannot be reconciled with express contrary statements in Schaefer itself.

IV.    Whether STMicroelectronics, Inc. may appear as a party in Appeal No. 22-1771 where it did not file an appearance, certificate of interest, or docketing statement in that appeal, and was estopped under 35 U.S.C. § 315(e) from appearing as a party in IPR2020-01492 below.

## STATEMENT OF THE CASE

### A.    The '134 Patent

United States Patent 6,651,134, titled Memory Device with a Fixed Length Non Interruptible Burst, is directed to "memory devices generally, and, more particularly, to a memory device that transfers a fixed number of words of data with each access." Appx53, Appx57 (1:5-9).

The '134 patent teaches that a conventional synchronous Random Access Memory (SRAM) "can provide data from multiple address locations using a single address," a feature called "burst mode," which "can be started and stopped in response to a control signal." Appx57 (1:10-18). Using burst mode in conventional Dynamic Random Access Memory (DRAM) devices at the time was "difficult because of the need to refresh" data within the memory cell "once every few

milliseconds," which creates the need for interrupts while bursts are "in progress," creating access time delays and complicating "the design of systems with shared data, address and control buses." Appx57 (1:19-42).

The '134 patent thus proposes, teaches, and claims an integrated circuit comprising a memory and a logic circuit "that has a fixed burst length," Appx57 (1:44-45), and that renders the burst "non-interruptible." Appx57 (1:57-61).

In the embodiment of Figure 2 (below), the address counter register 126 of circuit 102 receives the signals ADDR_EXT, LOAD, and CLK, while the burst counter 128 receives the signals ADV and BURST. Appx58 (3:65-4:2).



**FIG. 2**

The burst counter 128 presents the signal BURST_CLK to the address counter 126 when the signal ADV is asserted. Appx58 (4:10-14).

The '134 patent teaches that the signal BURST_CLK ensures that a specific, fixed, "predetermined number" of internal address signals are generated. In particular, the signal BURST_CLK contains "a number of ***pulses*** that has been programmed by the signal BURST." *Id.* (emphasis added). The address counter register 126 "increment[s] an address in response to the signal BURST_CLK," and burst counter 128 will continue generating internal address signals by a number of times equal to the ***number of pulses*** programmed into in the signal BURST_CLK in response to the signal BURST. Appx58 (4:8-10), Appx1220-1221 (¶¶ 72-73).

The '134 patent further teaches that the generation of fixed length bursts can be made "non-interruptible" by preventing burst counter 128 from stopping internal address signal generation until the number of addresses defined by the number of pulses programmed in the signal BURST_CLK has been reached. Appx1221 (¶75). To that end, the patent teaches:

- "When the signal ADV is asserted, the circuit 100 will generally begin transferring a predetermined number of words. The transfer is generally non-interruptible." Appx58 (3:6-13).

8

- "Once the circuit 102 has started generating the fixed number of addresses, the circuit 102 will generally not stop until the fixed number of addresses has been generated (e.g., a non-interruptible burst)." Appx58 (3:25-28).

The '134 patent's disclosures advanced the prior art by "free[ing] up the address bus and control bus for a known number of cycles," Appx58 (3:56-58), and providing "a more reliable and/or accurate burst than is possible with multiple chips," Appx58 (3:58-61), among other benefits. Appx57 (1:58-67).

In its Notice of Allowance, the examiner observed that in the prior art a "fixed burst length" could be terminated (and thus interrupted) by transitioning an external signal from one state to another. Appx449. Accordingly, the prior art did not "teach or fairly suggest the non-interruptible generation of a predetermined number of internal address signals." *Id.*

## B.    The challenged claims

In IPR2020-00985, STMicroelectronics, Inc. ("STMicro") challenged claims 1-21 of the '134 patent. Appx1. In IPR2020-01492, Qualcomm Inc. ("Qualcomm") challenged claims 1-7 and 9-21, but not claim 8. Appx35.

Claim 1 recites:

1.    A circuit comprising:

9

a memory comprising a plurality of storage elements each configured to read and write data in response to an internal address signal; and

a logic circuit configured to generate a predetermined number of said internal address signals in response to (i) an external address signal, (ii) a clock signal and (iii) one or more control signals, wherein said generation of said predetermined number of internal address signals is non-interruptible.

Independent claims 16 and 17 recite similar limitations. Appx6. The remaining challenged claims depend from claims 1, 16, and 17. *Id.*

### C.    The -985 IPR proceeding

In IPR2020-00985, Petitioner STMicro relied on anticipation based on U.S. Pat. 6,115,280 ("Wada"), as well as obviousness over Wada alone and the combination of Wada and U.S. Pat. 5,584,033 ("Barrett"). Appx6.

In its Petition, STMicro agreed that the limitation "generating a *predetermined* number of [ ] internal address signals" should at least be construed to require "a fixed number of internal address signals for burst access." Appx11.

To meet that limitation, STMicro relied on Wada alone, without modification, pointing to Wada's logic circuit 80 and burst counter 84 in Wada's

first embodiment, and circuit 8 in Wada's second embodiment. Appx99-102, Appx3380-3381, Appx23.

Appellant refuted both theories based on Wada's own teachings and supporting expert testimony. Appx1135-1139 (citing Appx1247-1259); Appx3723-3724. In particular, Appellant demonstrated that Wada's burst counters, in both embodiments, only stop generating internal address signals when the external advance signal ADV is released or the clock signal CLK fails to clock the external interface, and only continue generating internal address signals so long as those conditions do not occur. *Id.* As a result, Wada's burst counters will generate an indeterminate number of addresses, not any "predetermined number" as the claims require. *Id*.

The Board's decision agreed with Appellant that "Wada discloses that 'every time the clock signal CLK is at a leading edge and the advance signal ADV is High,' the internal address 'is incremented by the burst counter.'" Appx13. The Board thus found that Wada's burst counters have no predetermined upper bound. The Board further agreed with Appellant that "[i]n each circuit Wada describes, if the ADV signal is not maintained in a high state throughout a burst, the circuit will not continue generating addresses for the burst." Appx19. The Board thus found that Wada's burst counters have no predetermined lower bound. The Board additionally found that "Wada's two embodiments identified by Petitioner for the

11

claimed logic circuit offer no functional difference for our analysis." Appx18 (emphasis added).

The Board declined, however, to conclude that Wada alone cannot anticipate or render obvious the challenged claims on that basis. Instead, the Board avoided that conclusion by pivoting to find that Wada's second embodiment, once modified in view of Barrett, meets that limitation. Appx24. In particular, the Board stated: "when Wada is modified in light of Barrett, the result is a system in which a burst cannot be stopped once started." Appx24. The Board then found that such a system, in the context of Wada's second embodiment, would generate a predetermined number of four internal address signals. Appx 24. Notably, the Board did not explain, and made no finding, as to how Wada's modified burst, which "cannot be stopped once started," would stop generating internal address signals at four—a capability that Wada never had in unmodified form. Moreover, the Board did not explain why it relied on Wada modified in view of Barrett to meet "generating a predetermined number of internal address signals" when STMicro had never raised that argument, and had instead only relied on Wada alone for that limitation. Appx99-102, Appx3380-3381.

With respect to the challenged claims' separate requirement that "said generation of said predetermined number of internal address signals is ***non-interruptible***," the parties agreed that the limitation means "cannot be stopped or

12

terminated once initiated until the fixed number of internal addresses has been generated." Appx8. The Board adopted that construction. *Id.*

To meet the "non-interruptible" limitation, STMicro relied on Wada alone, as well as Wada modified in view of Barrett. Appx99-103, Appx123-126.

Appellant demonstrated that Wada alone does not disclose the "non-interruptible" limitation because Wada does not continue generating internal address signals unless the external signal ADV is kept in the state "High." Appx1140-1144 (citing Appx1260-1265); Appx3718-3720. Thus, if the ADV signal is ***not*** kept High, Wada will stop generating internal address signals, allowing the address signal generation process to be interrupted. *Id.*

Appellant further demonstrated that the "non-interruptible" limitation would not have been obvious over the combination of Wada and Barrett because, among other shortcomings, STMicro had not provided any evidence or analysis sufficient to show that an ordinary artisan would have had a reasonable expectation of success in combining those references to arrive at the claimed invention, Appx1160-1161, and an ordinary artisan would ***not*** have had a reasonable expectation of success in that endeavor. Appx1161-1162. Appellant further demonstrated that petitioners had not shown ***how*** Wada's system, modified in view of Barrett, could actually operate to provide a "non-interruptible" predetermined number of internal address signals. Appx3728-3729.

13

The Board's final written decision agreed with Appellant that "[i]n each circuit Wada describes, if the ADV signal is not maintained in a high state throughout a burst, the circuit will not continue generating addresses for the burst." Appx19 (emphasis added). The Board further applied Appellant's claim interpretation "that a non-interruptible burst does not require the control signals be maintained in a particular state once a burst begins." Appx10.

As a result, the Board did not find that Wada alone discloses "non-interruptible" internal address signal generation. Instead, the Board turned to petitioners' alternative theory of modifying Wada in view of Barrett. Appx19. The Board acknowledged "it is possible that Barrett's approach would create a problem if implemented in Wada's system." Appx22. But the Board found that "Petitioner's proposed combination includes only the particular desire to prohibit interruptions within Wada's bursts." Appx22 (emphasis added).

The Board then found that STMicro did not need to make any particular showing as to a reasonable expectation of success or enablement based on the prior art because, according to the Board, "the '134 patent contains no detail about how its circuit renders a burst non-interruptible," and thus "the '134 patent precludes Patent Owner's argument that Petitioner needed to show additional detail regarding how to implement the asserted combination." Appx21. At the same time, the Board relied on the '134 patent's teachings regarding predetermining a specific number of

internal address signals by programming a specific number of pulses into the

BURST_CLK signal, as well as testimony from Appellant's expert regarding those

teachings, to conclude (based on the '134 patent's own teachings) that an ordinary

artisan would have known how to modify Wada to create a non-interruptible burst.

Appx21. The Board cited no evidence that the disclosure of the '134 patent

regarding non-interruptible fixed length burst generation was known in the prior

art. The Board also never identified any specific modification the ordinary artisan

could have made to Wada, with a reasonable expectation of success, to enable the

artisan to make and use the claimed invention of the '134 patent. *Id.*

### D.    The -1492 IPR proceeding

In IPR2020-01492, Petitioner Qualcomm challenged claims 1-7 and 9-21 of

the '134 Patent as anticipated by U.S. Pat. 5,600,605 ("Schaefer"). Although

STMicro was initially joined in that proceeding, the Board ultimately concluded

that STMicro was not a petitioner and not a party to the -1492 IPR because it was

estopped from participating in the proceeding under 35 U.S.C. §315(e). Appx35.

The parties' substantive dispute before the Board as to Schaefer centered

around a narrow issue framed by significant undisputed facts. Although Qualcomm

did not dispute that Schaefer does disclose burst interruptions, Qualcomm argued

that Schaefer's optional AUTO-PRECHARGE function created an exception to

those teachings, and that when the AUTO-PRECHARGE option was activated,

Schaefer's bursts became "non-interruptible" until a "predetermined number of internal address signals" had been generated, as required by the challenged claims. Appx5499.

In support, Qualcomm relied on an annotated version of Schaefer's Fig. 4 to argue that when a read or write command is issued with the AUTO-PRECHARGE option selected (at time $t_2$ below), the resulting internal address signal generation becomes non-interruptible *from $t_2$ to $t_9$*, *i.e.*, for an entire fixed burst length.



FIG. 4

Appx4030.

Appellant, by contrast, demonstrated that Schaefer's own text establishes that the AUTO-PRECHARGE option only prevents interruptions during the

precharge period, *from $t_6$ to $t_9$* (shown in green above), not for the entire fixed length burst, as the challenged claims require. Appx5595-5601.

Appellant further demonstrated, through the testimony of Qualcomm's own expert, that allowing interruptions during all bursts is necessary and critical to Schaefer's goal of avoiding wasted clock cycles. Appx5261-5284, Appx5339-5359, Appx5596-5612.

In its final written decision, the Board correctly identified the parties' dispute as "whether Schaefer's prohibition on user commands begins with the issuance of a read or write command using the AUTO-PRECHARGE option (time $t_2$ in Figure 4) as Petitioner contends, or instead begins only when the resulting precharge operation begins (time $t_6$ in Figure 4) as Patent Owner contends." Appx44-45.

The Board sided with Qualcomm on that issue, interpreting Schaefer's text, and one sentence in particular, as teaching "prohibition of user commands from the time a fixed-length burst is initiated with AUTO-PRECHARGE selected," *i.e.*, from time $t_2$. Appx47, Appx45. On that basis, the Board found that Schaefer discloses non-interruptible internal address generation. Appx48.

### SUMMARY OF THE ARGUMENT

The Board may not "raise, address, and decide unpatentability theories never presented by the petitioner and not supported by the record evidence." *In re*

*Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016). When the Board violates those limits, it commits "reversible error." *Oren Techs., LLC v. Proppant Express Invs. LLC*, No. 2019-1778, 2021 U.S. App. LEXIS 21859, at *14-15 (Fed. Cir. July 23, 2021). The Board's decision in IPR2020-00985 exceeds its authority by relying on a new obviousness theory as to "generating a predetermined number of internal address signals," based on Wada *modified* in view of Barrett, that STMicro never presented for that limitation. The Board's decision should be set aside on that basis.

Moreover, the Board's conclusion of obviousness as to the "predetermined number" limitation is substantively erroneous. According to the Board itself, Wada modified in view of Barrett would "result i[n] a system in which a burst cannot be stopped once started." Appx24. But Wada's bursts have no predetermined or fixed length; they simply continue until the external signal ADV is no longer maintained in the state "High." Appx13; Appx19. Modifying Wada so "a burst cannot be stopped once started," Appx24, would not cure that misalignment with the challenged claims; it would only make it worse by causing bursts to continue *indefinitely*. Substantial evidence thus does not support the Board's decision as to "generating a predetermined number of internal address signals."

The Board's conclusion of obviousness as to the "non-interruptible" limitation based on Wada modified in view of Barrett is likewise fatally flawed.

18

Obviousness based on a modification theory cannot be found without evidence and an explanation as to specifically *how* the prior art could have been modified to arrive at the claimed invention with a reasonable expectation of success, and so as to enable the ordinary artisan to make and use the claimed invention. *See, e.g., KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007); *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012); *KEYnetik, Inc. v. Samsung Elecs. Co.*, 841 F. App'x 219, 227 (Fed. Cir. 2021); *Raytheon Techs. Corp. v. GE*, 993 F.3d 1374, 1380 (Fed. Cir. 2021). Mere "knowledge of the goal does not render its achievement obvious." *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1352 (Fed. Cir. 2008).

Yet contrary to those core principles, the Board's decision provides no explanation or finding as to how Wada could have been modified in view of Barrett, with a reasonable expectation of success, to arrive at "non-interruptible" burst generation based on knowledge *in the prior art*.

The Board's silence on that core issue is particularly striking given its finding that Wada's internal address generation is interruptible by design. Appx19 ("In each circuit Wada describes, if the ADV signal is not maintained in a high state throughout the burst, the circuit will not continue generating addresses for the burst.").

Thus, although the Board found that Wada's logic circuit must be modified to meet the "non-interruptible" limitation, the Board concluded that neither it nor STMicro needed to "show additional detail regarding how to implement" any particular modification, and the Board identified no specific modification at all. Appx21. Instead, the Board looked to the disclosures of the '134 patent and Appellant's expert's testimony regarding the '134 patent's teachings as evidence of a reasonable expectation of success and obviousness. Appx21. But as this Court has made clear, "the inventor's own path itself *never* leads to a conclusion of obviousness; that is hindsight." *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 162 (Fed. Cir. 2021) (emphasis added); *TQ Delta, LLC v. Cisco Sys.*, 942 F.3d 1352, 1362 (Fed. Cir. 2019). Indeed, the Board cited no evidence that the disclosure of the '134 patent regarding non-interruptible fixed length burst generation was known *in the prior art*. The Board's reliance on the '134 patent as an end-run around this Court's obviousness requirements was erroneous, and the Board's decision in the -985 IPR should be reversed on that additional basis.

Finally, the Board's decision in the -1492 IPR rests on a misinterpretation of Schaefer's text that is contradicted by, and cannot be reconciled with, multiple express statements in Schaefer itself. The dispute before the Board centered on whether Schaefer's statement that "[t]he user is not allowed to issue another command until the precharge time ($t_{RP}$) is completed" should be read to prohibit

20

"another command" from the time the precharge operation begins at **_time t₆_** in Figure 4 (in which case Schaefer cannot anticipate), or from **_time t₂_** in Figure 4, as Qualcomm alleged. The Board's decision assumed that the phrase "another command" necessarily referred back to the read or write command issued at time t₂, and that Schaefer thus disclosed "non-interruptible" fixed length burst generation. Appx45, Appx47. But to the contrary, Schaefer's own immediately surrounding text refers to the "**_AUTO-PRECHARGE command_**"—**_not_** the read or write command—as the last command after which "another command" cannot issue "until the precharged time (t$_{RP}$) is completed." Appx4564 (7:40-47). And Schaefer further expressly states, *twice*, that the AUTO-PRECHARGE command is issued at **_time t₆_**. Appx4564 (8:65-9:1) ("**_at time t₆ the AUTO-PRECHARGE command is internally performed_**"); Appx4565 (9:60-65) ("In one embodiment of the invention, indicating circuitry 80 is implemented with a time out circuit which begins timing from the beginning of the PRECHARGE **_or AUTO-PRECHARGE command_** such at **_time t₆_** and based on an internal timer"). Numerous other statements in Schaefer likewise consistently provide that the AUTO-PRECHARGE command comes "following" and "after" the read and write commands, not at the same time as those commands, as the Board found. Appx4561 (2:50-53), Appx4562 (4:53-56), Appx4563 (5:28-33), Appx4564-4565 (8:61-9:4), Appx4565 (9:16-22). The Board's finding that Schaefer's AUTO-

21

PRECHARGE feature prevents burst interruptions beginning at time $t_2$ is therefore clearly erroneous, and its conclusion of anticipation should thus be reversed.

### ARGUMENT

### STANDARD OF REVIEW

Obviousness is a question of law based on subsidiary findings of fact. *Intelligent Bio–Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1366 (Fed. Cir. 2016). This Court reviews the Board's legal conclusions, including the Board's ultimate conclusion of obviousness, *de novo*. *Owens Corning v. Fast Felt Corp.*, 873 F.3d 896, 901-902 (Fed. Cir. 2017).

The Board's factual findings are reviewed for substantial evidence. *Owens Corning*, 873 F.3d at 902. "[S]ubstantial evidence review requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion." *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1356 (Fed. Cir. 2018). "The Board's selective weighing of the record evidence does not pass muster under the APA" under substantial evidence review. *Id.* at 1353.

I.   **The Board's finding that the combination of Wada and Barrett meets "a predetermined number of internal address signals" impermissibly relies on a new theory, and nonetheless lacks substantial evidence**

A.   **The challenged claims require "generating a *predetermined* number of [ ] internal address signals"**

Challenged claims 1-21 of the '134 patent all require "generating a *predetermined* number of [ ] internal address signals." The Board implicitly construed "a predetermined number" as "a fixed number." Appx8 (construing "predetermined number of internal address signals [that] is non-interruptible" as "cannot be stopped or terminated once initiated until the ***fixed*** number of internal addresses has been generated") (emphasis added). That implicit construction was consistent with the Petition's claim interpretation position. Appx11. It was also consistent with the '134 Patent's consistent and repeated teachings. Appx53 ('134 patent titled "Memory Device with a ***Fixed Length*** Non Interruptible Burst"); Appx57 (1:37-45) (proposing a memory device "that has a ***fixed*** burst length"); Appx58 (3:21-22) (disclosing that in Fig. 1, circuit 100 is configured as a ***fixed*** burst memory and "generate[s] . . . a ***fixed*** number of addresses in response to the signal CLK") (emphases added). Moreover, the Board's implicit construction that "a predetermined number" must be a "fixed" number is also consistent with prior claim constructions from the International Trade Commission and the district court. *See In re Certain Static Random Access Memories and Products Containing Same*, 337-TA-792, 2012 ITC LEXIS 2543, *30 (Oct. 25, 2012) (construing

23

"predetermined number" as "fixed number"); *Cypress Semiconductor Corp. v. GSI Tech., Inc.*, No. 13-cv-02013-JST, 2014 U.S. Dist. LEXIS 105363, at *22 (N.D. Cal. July 29, 2014) (same construction).

Because the limitation requires generating a "***predetermined***," *i.e.*, "***fixed***" number of internal address signals, the claims are not satisfied by simply generating *some* number of internal address signals, or a mere "burst" of indefinite length. Rather, the claims require that the number of generated internal address signals must have been "predetermined" or "fixed" prior to the internal address generation. *Id.* For instance, if the number of internal address signals generated in a particular instance *could be* two or four or six, and the number ultimately generated is four, then there is no "predetermined number of internal address signals," since no specific number of internal address signals was fixed, prior to generation, as the number to be generated for that burst.

Moreover, the "predetermined" or "fixed" number of internal address signals, by definition, cannot be met by a *range* of internal address signals, such as "*at least* four" or "*at most* 20." In such a circumstance, there would be no particular "fixed" or "predetermined number" of internal address signals, and thus the limitation would not be met. Stated otherwise, if the number of internal address signals to be generated could be, for instance, *any* number 4 or greater, then there would be no "fixed" or "predetermined number" of internal address signals at all,

since the specific number of internal address signals to be generated would be indeterminate.

**B.    To meet the limitation, the Petition presented two theories based on Wada alone, which Appellant demonstrated to be incorrect**

In IPR2020-00985, the Petition's theories as to "generating a predetermined number of [ ] internal address signals" relied on Wada's first (or "conventional") embodiment, and Wada's second embodiment. Appx99-102.

With respect to Wada's first embodiment, the Petition pointed to logic circuit 80 and burst counter 84, and argued that the number of address signals to be generated by burst counter 84 is $2^k$, where "k" represents the number of bits separated from an n-bit external address signal (EXT.ADD) for incrementing to create the internal address signal (INT.ADD). Appx99-100, Appx22.

But as the Petition itself acknowledged, and as Appellant showed below, Wada states that "when the advance signal ADV is brought High," a new internal address is generated "***every time*** a leading edge of the clock signal CLK is encountered." Appx100 (quoting Appx481 (2:56-61)) (emphasis added).

Thus, as Appellant demonstrated below, burst counter 84 in Wada's first embodiment blindly increments addresses ***indefinitely*** so long as an external signal—the external advance signal ADV—is maintained in the state "High" and the clock signal CLK is at a leading edge. Appx1135-1137 (citing Appx1247-1253). The burst counter 84 stops only once the external advance signal ADV is

released or the clock signal CLK fails to clock the external interface. *Id.* The

upshot is that Wada's burst counter 84 may generate ***less than or more than*** 2^k

addresses: if the advance signal is not kept high or the clock signal CLK fails to

clock the external interface before 2^k addresses have been generated, burst

counter 84 will not reach 2^k; conversely, if the advance signal ADV is maintained

high and the clock signal CLK is at a leading edge, burst counter 84 will continue

to generate addresses ***beyond*** 2^k and the counter will simply "wrap around" like a

conventional clock. *Id.* Indeed, Appellant explained that the consequence of

Wada's design is that ***nothing prevents*** burst counter 84 from generating ***more***

than 2^k addresses. Appx1137 (citing Appx482 (3:5-9), Appx1250-1251)).

Appellant thus established that Wada's first embodiment does ***not*** necessarily

generate 2^k addresses, and does not generate any specific number of internal

addresses that was ***predetermined*** or ***fixed*** prior to internal address signal

generation. Appx1135-1137 (citing Appx1247-1253), Appx3723-3724.

As for Wada's second embodiment, the Petition pointed to circuit 8, which it

argued generates an internal address (INT.CHA) that selects one of four inputs of

multiplexer 7 to extract data from four memory locations. Appx101-102, Appx23.

The Petition argued that in this second embodiment, Wada generates a

predetermined number of four internal address signals. In particular, the Petition

stated that external addresses An (arriving as a MADD signal) and Ac (arriving as

an EXT.CHA signal) cause internal address INT.CHA to take on four values, Ac through Ac+3. Appx102. The Petition further argued that another set of external addresses Am (MADD) and Ad (EXT.CHA) cause INT.CHA to take on four more values Ad through Ad+3. *Id.*

But as the Petition again acknowledged, the addresses in Wada's second embodiment are simply "generated in response to external address signals MADD and EXT.CHA (which arrive from outside the circuit) and clock signal CLK." Appx102. Thus, as Appellant demonstrated below, Wada's burst counter 8 (like burst counter 84) simply blindly increments in response to *every* edge of clock signal CLK. Appx1137 (citing Appx482 (4:24-28), Appx1255). The consequence, once again, is that Wada's second embodiment does not *predetermine* or *fix* the number of INT.CHA signals generated at four, and discloses no means for preventing burst counter 8 from generating *less than or more than* four INT.CHA signals. Appx1138-1139 (citing Appx1257-1259), Appx3723-3724.

In short, Appellant demonstrated that Wada does not disclose generating any "*predetermined number*" of internal address signals, but rather may generate *more or less* than either 2^k or four internal addresses in any instance.

### C.    The Board's decision improperly relied on a new theory of its own creation, and nonetheless lacks substantial evidence

The Board's decision agreed with Appellant that "Wada discloses that 'every time the clock signal CLK is at a leading edge and the advance signal ADV

is High,' the internal address 'is incremented by the burst counter.'" Appx13 (quoting Appx482 (3:5-9)). The Board thus found that Wada continues generating internal addresses indefinitely under those conditions, *i.e.*, Wada's burst counters have ***no predetermined upper bound***.

The Board further agreed with Appellant that "***[i]n each circuit Wada describes,*** if the ADV signal is not maintained in a high state throughout a burst, the circuit will ***not continue*** generating addresses for the burst." Appx19 (citing Appx481-482 (2:55-59, 3:5-9)) (emphasis added). The Board thus found that Wada's burst counters have ***no predetermined lower bound***.

The Board additionally found that "Wada's two embodiments identified by Petitioner for the claimed logic circuit offer ***no functional difference*** for our analysis." Appx18 (emphasis added). The Board thus foreclosed any basis for finding that one of Wada's embodiments meets the limitation if the other does not.

But rather than acknowledge that Wada's embodiments therefore could not meet "generating a predetermined number of internal address signals," the Board instead pivoted to find that Wada's second embodiment, ***modified in view of Barrett***, meets that limitation. Appx24.

In particular, the Board stated: "when Wada is modified in light of Barrett, the result is a system in which a burst cannot be stopped once started." Appx24. The Board then found that such a system, in the context of Wada's second

28

embodiment, would "generate[ ] the expected number of addresses—one for each multiplexer 60a through 63a," *i.e.*, four internal addresses. Appx 24.

The Board's approach and its conclusion were erroneous in two respects, and should be reversed.

***First***, by relying on Wada ***modified*** in view of Barrett to meet the "predetermined number of internal address signals" limitation, the Board improperly relied on a new theory of its own creation.

This Court has expressly held that the PTAB lacks authority "to raise, address, and decide unpatentability theories never presented by the petitioner and not supported by the record evidence." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016). Rather, *inter partes* review "is still a system that is predicated on a petition followed by a trial in which the petitioner bears the burden of proof." *Id.* Thus, the Board is not "free to adopt arguments on behalf of petitioners that could have been, but were not, raised by the petitioner during an IPR. Instead, the Board must base its decision on arguments that ***were advanced by a party***, and to which the opposing party was given a chance to respond." *Id.* (emphasis added). When the Board violates those limits by advancing and relying on arguments and theories in its final written decision that were never raised by petitioners, the Board commits "reversible error." *Oren Techs., LLC v. Proppant Express Invs. LLC*, No. 2019-1778, 2021 U.S. App. LEXIS 21859, at *14-15 (Fed.

Cir. July 23, 2021) (holding that the Board's reliance on petitioner's motivation to combine theory as evidence that a specific limitation was met, which petitioner itself never argued, "was reversible error because the petitioner bears the burden of proving obviousness and Oren had no notice or opportunity to respond.").

Here, the Petition's theories as to "generating a predetermined number of internal address signals" relied exclusively on Wada's own teachings, ***without*** modification. Appx99-102. STMicro's post-institution arguments likewise exclusively relied on Wada's own teachings, without modification, to meet that limitation. Appx3380-3387. STMicro at no point relied on any modification to Wada in view of Barrett to meet the "generating a predetermined number of internal address signals" limitation. Rather, it relied on Wada modified in view of Barrett to arrive at the *separate* limitation that "the generation of said predetermined number of internal address signals is *non-interruptible*." Appx123-126, Appx3390-3391, Appx19-22. In particular, STMicro relied on Barrett for the motivation to modify Wada to achieve non-interruptible burst generation. Appx3390-3391.

Indeed, STMicro expressly stated: "Petitioner ***never alleges*** that Wada is missing any protocol, handshaking signal, or other device for effecting burst communications between a CPU and memory device that Barrett might need to provide." *Id* (emphasis added).

The facts here are thus like those in *Oren Techs.*, No. 2019-1778, 2021 U.S. App. LEXIS 21859, at \*14-15, and *In re Magnum*, 829 F.3d at 1381. In *Oren Techs.*, the PTAB "repurpos[ed] the theory of a motivation to modify Smith to increase its capacity" in order to find that the "30,000 pound limitation" of the challenged claims was met. *Oren Techs*, No. 2019-1778, 2021 U.S. App. LEXIS 21859, at \*14-15. That was "reversible error." *Id.*

The Board's conduct here also closely matches the facts in *In re Magnum Oil Tools*. There, the Board relied on petitioner's motivation to combine as to one set of references in order to find a motivation to combine another set of references, despite petitioner never having articulated that argument in any detail. 829 F.3d at 1377-78. This Court made clear that the Board may not undertake petitioners' burden of proof by creating and relying upon arguments and evidence of unpatentability beyond those presented by petitioners themselves, and reversed on that basis. *Id.* at 1380-81.

Here, as in *Oren Techs.* and *In re Magnum*, the Board committed reversible error by repurposing Petitioner's theory as to one limitation in order to find unpatentability as to a different limitation for which Petitioner made no such argument. More specifically, the Board attempted to fix defects with STMicro's "predetermined number" theory, for which it had relied on Wada alone, by repurposing STMicro's separate theory regarding the "non-interruptible"

31

limitation, for which STMicro had relied on Wada modified in view of Barrett. That is "reversible error," *Oren Techs.*, No. 2019-1778, 2021 U.S. App. LEXIS 21859, at *14-15, and the Board's decision should be set aside on that basis.

***Second***, the Board's decision fails to demonstrate that Wada modified in view of Barrett actually meets "generating a predetermined number of internal address signals."

The Board began with the premise that "generating the expected number of addresses in Wada depends on completing an uninterrupted burst." Appx24. The Board then reasoned from that premise that if Wada's bursts were modified in view of Barrett such that they would be "***uninterrupted***," the resulting burst counter would "generate[ ] the expected number of addresses—one for each multiplexer 60a through 63a." Appx24 (emphasis added). In particular, the Board found that "when Wada is modified in light of Barrett, the result is a system in which a burst ***cannot be stopped*** once started." Appx24 (emphasis added).

The Board's logic does not support its conclusion of obviousness. Modifying Wada's bursts such that they "cannot be stopped once started," Appx24, creates no ***upper limit*** for the number of internal addresses Wada would generate in any given instance. As the Board itself found, "Wada discloses that '***every time*** the clock signal CLK is at a leading edge and the advance signal ADV is High,' the internal address 'is incremented by the burst counter.'" Appx13 (quoting Appx482

32

(3:5-9)) (emphasis added). Thus, Wada's bursts have no predefined length, but are instead of indeterminate length.

The Board's modification in view of Barrett would only make that problem worse. If Wada's modified bursts "***cannot be stopped once started***," as the Board stated, Appx24, then Wada's bursts would not only be indeterminate in length, they would continue ***indefinitely***. Stated otherwise, modifying Wada's system such that "a burst cannot be stopped once started," Appx24, would do nothing to ***stop*** the generation of internal address signals at any ***specific predetermined number***, as the claims require.

Moreover, while the Board's reasoning seemed to rest on the finding that Wada's second embodiment stops generating addresses once it has generated an address from each of its four multiplexers, *i.e.*, at four addresses, Appx24, substantial evidence does not support that finding, and the Board's own earlier findings contradict it. As the Board itself found, "Wada discloses that 'every time the clock signal CLK is at a leading edge and the advance signal ADV is High,' the internal address 'is incremented by the burst counter.'" Appx13 (quoting Appx482 (3:5-9)). And the Board additionally found that "Wada's two embodiments identified by Petitioner for the claimed logic circuit offer ***no functional difference*** for our analysis." Appx18 (emphasis added). It thus necessarily follows that Wada's second embodiment (like Wada's first embodiment) does not stop

generating internal addresses at four addresses (or any other predetermined number), but instead continues to generate addresses so long as the external advance signal is High. Appx1137-1139 (citing Appx482 (4:24-28), Appx1255-1259), Appx3723-3724. Modifying Wada so that "a burst cannot be stopped once started," Appx24, would only further compel that conclusion.

Nor could the Board find the claims satisfied on the premise that Wada's modified bursts would contain **at least** four or $2^k$ internal address signals. The claims' requirement of a "predetermined" or "fixed" number is not satisfied by a *range*, much less a range with no upper limit. *See* Section I.A, *supra*. Stated otherwise, finding that Wada's burst length would be *at least* four or *at least* $2^k$ is equivalent to finding that Wada's burst length could be **any number** from four or $2^k$ to infinity, which is no "predetermined" number at all.

Thus, Wada's burst counters—whether modified under the Board's theory or in unmodified form—do not generate any specific, fixed, "predetermined number" of internal address signals. Instead, they merely generate **a number** of internal address signals in response to an external address signal, a clock signal, and a control signal, which does not meet the claims.

Accordingly, the Board's finding that the combination of Wada and Barrett meets "generating a predetermined number of internal address signals" lacks substantial evidence, and should be reversed on that additional basis.

**II.    The Board's conclusion that the "non-interruptible" limitation was obvious in view of Wada modified by Barrett is not supported by substantial evidence as a matter of law**

**A.    All challenged claims require "non-interruptible" internal address signal generation**

Challenged claims 1-21 of the '134 patent all require that "said generation of said predetermined number of internal address signals is ***non-interruptible***." Under the parties' agreed construction, which the Board adopted, a "non-interruptible" generation of a predetermined number of internal address signals is one that "cannot be stopped or terminated once initiated until the fixed number of internal addresses has been generated." Appx8.

**B.    The Petition sought to meet that limitation based on Wada alone and in combination with Barrett, but failed as to both theories**

To meet the "non-interruptible" internal address signal generation limitation in IPR2020-00985, the Petition relied on Wada alone, as well as Wada modified in view of Barrett. Appx99-103, Appx123-126.

Before the Board, Appellant demonstrated that Wada alone does not disclose the "non-interruptible" limitation. Appx1140-1144 (citing Appx1260-1265), Appx3718-3720. In particular, Appellant showed that Wada does not continue generating internal address signals unless the external signal ADV is kept in the state "High." *Id.* Conversely, Appellant established that if the ADV signal is ***not*** kept High, Wada will stop generating internal address signals, thus ***interrupting*** the address generation process. *Id.*

Since Wada's internal address signal generation process can be interrupted by changing the state of its ADV signal, Wada's process is interruptible, and cannot meet the "non-interruptible" limitation of the claims. *Id.*

Appellant further demonstrated that the "non-interruptible" limitation would not have been obvious over the combination of Wada and Barrett. Among other arguments, Appellant explained that petitioners had not provided any evidence or analysis to show that an ordinary artisan would have had a reasonable expectation of success in combining those references to arrive at the claimed invention. Appx1160-1161. Appellant further explained why an ordinary artisan would *not* have had a reasonable expectation of success. Appx1161-1162.

Moreover, Appellant demonstrated that petitioners had not provided an adequate explanation as to ***how*** Wada's system, modified in view of Barrett, could actually operate to provide a "non-interruptible" predetermined number of internal address signals. Appx3728-3729.

Specifically, while petitioners had proposed "to force the signal ADV to a high state during the duration of the burst," they did not "explain ***how*** this would be accomplished." Appx3728 (emphasis added). For instance, petitioners had not explained "how Wada's control circuit would have been modified, e.g., through a hardware or software modification, to accommodate the revised control circuit that generates a different ADV signal based on the same inputs." Appx3729. And

petitioners had also failed to explain how the modified system would "handle overflows of data when the burst output produces more data than can be consumed by the receiving device." *Id.*

And while petitioners had separately proposed to achieve uninterruptible address signal generation by stopping Wada's clock, Appellant refuted that proposal as entirely self-defeating. As Appellant explained, stopping Wada's clock would "pause operation of Wada's system, because synchronous (i.e., clocked) systems need a clock to operate," and in any case, "stopping the clock would not result in an uninterruptible burst output, because without a clock, there would be no burst output to interrupt." *Id.* Thus, Appellant demonstrated that petitioners' alternative "clock stopping" theory also failed to demonstrate that an ordinary artisan would have had a reasonable expectation of success in modifying Wada to render its internal address generation "non-interruptible."

### C. The Board nonetheless found the limitation obvious based on Wada modified in view of Barrett, without substantial evidence to support its conclusion of obviousness as a matter of law

The Board's final written decision agreed with Appellant that "[i]n each circuit Wada describes, if the ADV signal is not maintained in a high state throughout a burst, the circuit ***will not continue*** generating addresses for the burst." Appx19 (emphasis added). The Board thus agreed that Wada's internal address signal generation depends on, and can be interrupted by, the state of the

37

external signal ADV. *Id.* The Board further applied Appellant's claim interpretation "that a non-interruptible burst does not require the control signals be maintained in a particular state once a burst begins." Appx10. The Board therefore did not find that Wada alone discloses "non-interruptible" internal address signal generation, since Wada's internal address signal generation depends on maintaining its external signal ADV in the High state, and is thus interruptible.

Instead, the Board turned to petitioners' alternative theory of modifying Wada in view of Barrett. Appx19.

With respect to Appellant's showing that Barrett teaches a highly different system than Wada, such that Barrett's alleged teachings regarding non-interruptibility would be incompatible with Wada, the Board acknowledged "it is possible that Barrett's approach would create a problem if implemented in Wada's system." Appx22.

The Board, however, found that "Petitioner's proposed combination includes ***only*** the particular ***desire*** to prohibit interruptions within Wada's bursts." Appx22 (emphasis added). Thus, the Board made clear that it was not looking to any technical teachings from Barrett for evidence of a reasonable expectation of success at arriving at the challenged claims, or that the ensuing combination would have been enabled to practice the claimed invention. Instead, the Board stated that

it was only looking to Barrett for the alleged teaching of a "desire" to prohibit interruptions within a burst.

Turning to the issues of a reasonable expectation of success and enablement of the obviousness combination, the Board found that Petitioners did not need to make any particular showing on those issues. Appx21. Instead, the Board looked to the '134 patent itself and found that "the '134 patent contains no detail about how its circuit renders a burst non-interruptible," and concluded that "[b]y treating such details as within the ordinary skill in the art, the '134 patent precludes Patent Owner's argument that Petitioner needed to show additional detail regarding how to implement the asserted combination." Appx21. Yet in the immediately following sentence, the Board cited to testimony from Appellant's expert regarding ***the '134 patent's teachings*** as evidence that a "***reader***" of the '134 patent would understand, ***based on its teachings***, how to achieve the '134 patent's claimed non-interruptible fixed length burst circuit design. Appx21. In particular, the Board focused on the '134 patent's disclosure that a predetermined number of pulses can be programmed into a BURST_CLK signal to ensure that a predetermined number of internal address signals, corresponding to the number of pulses in the BURST_CLK signal, will generate a fixed length burst without the need for an external stopping signal that could interrupt the burst. *Id.* It then concluded on

those bases that "the required modification would have been well within the ordinary skill in the art." *Id.*

The Board's approach and conclusion were erroneous and should be reversed for four reasons.

***First***, obviousness cannot be found by combining Wada with the mere "desire to prohibit interruptions," as the Board found. Appx22.

"A patent composed of several elements is not proved obvious by merely demonstrating that each of its elements was, independently, known in the prior art." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). Rather, proof of an obviousness modification requires an explanation as to "how specific references could be combined" and "how any specific combination ***would operate*** or read on the [challenged] claims." *ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) (emphasis added). That requirement cannot be met by "a conclusory statement that a person of ordinary skill in the art would have known . . . how . . . to achieve the claimed inventions." *Id.* Rather, such a conclusory assurance is "not sufficient and is fraught with hindsight bias." *Id.* (citing *KSR*, 550 U.S. at 418, and *Innogenetics, N.V., v. Abbott Labs.*, 512 F.3d 1363, 1373-74 (Fed. Cir. 2008)).

Here, the Board made no finding as to how Wada and Barrett could actually be combined, and how any specific combination would ***operate*** or read on the

claims. *ActiveVideo*, 694 F.3d at 1327. Instead, the Board simply relied on Barrett for the teaching of a "***desire*** to prohibit interruptions," Appx 22 (emphasis added), and concluded that "the ***required modification*** would have been well within the ordinary skill in the art." Appx21 (emphasis added). As in *ActiveVideo*, that "is not sufficient and is fraught with hindsight bias." 694 F.3d at 1327.

Crucially, the Board's own findings establish that Wada's logic circuit would have required significant modifications in order to meet the "non-interruptible" limitation while remaining operational. As the Board itself found, Wada's internal address signal generation ***depends*** on the external signal ADV being maintained in the state High. Appx13, Appx19. When the ADV signal is High, signal generation ***starts and continues***; when it is not High, signal generation ***stops***. Appx13, Appx19. Thus, it necessarily follows that to make Wada's signal generation "non-interruptible," Wada would somehow have to be modified such that address signal generation would ***not*** stop if the ADV signal were not High. Appx10 ("we apply Patent Owner's view—that a non-interruptible burst does not require the control signals be maintained in a particular state once a burst begins."). At the same time, Wada would need some other mechanism to stop address signal generation. Accordingly, Wada cannot meet the "non-interruptible" limitation without ***some modification*** to its technical design.

The Board, however, made no finding as to **what** those modifications would be, **how** any such modifications would in fact operate to meet the claims, or **why** it would have been obvious for an ordinary artisan to undertake those specific modifications.

The Board instead made a sweeping and conclusory finding that **any** "required modification would have been well within the ordinary skill in the art." Appx21. That was legal error and cannot support a conclusion of obviousness. *ActiveVideo*, 694 F.3d at 1327-28 (rejecting evidence of obviousness that "bears no relation to **any specific combination** of prior art elements"); *TQ Delta, LLC v. Cisco Sys.*, 942 F.3d 1352, 1361 (Fed. Cir. 2019) (rejecting reliance on conclusory assertions as evidence of obviousness because that approach "risks allowing the challenger to use the challenged patent as a roadmap to reconstruct the claimed invention using disparate elements from the prior art—i.e., the impermissible *ex post* reasoning and hindsight that *KSR* warned against") (citing *KSR*, 550 U.S. at 418, 421; *ActiveVideo*, 694 F.3d at 1327-28; *DSS Tech. Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1374-77 (Fed. Cir. 2018); *In re Van Os*, 844 F.3d 1359, 1361-62 (Fed. Cir. 2017); *InTouch Techs., Inc. v. VGo Commc'ns, Inc.*, 751 F.3d 1327, 1349 (Fed. Cir. 2014)).

42

Because the Board made no finding as to how an ordinary artisan could have modified Wada to arrive at "non-interruptible" internal address generation, the Board's conclusion of obviousness should not be sustained.

***Second***, by failing to make any finding as to how Wada could have been modified to change the need for its ADV signal to remain High in order to generate internal address signals, the Board short-circuited and failed to meet the dual requirements of a reasonable expectation of success and enablement.

"Where a party argues a skilled artisan would have been motivated to combine references, it must show that the artisan 'would have had a reasonable expectation of success from doing so.'" *KEYnetik, Inc. v. Samsung Elecs. Co.*, 841 F. App'x 219, 227 (Fed. Cir. 2021) (quoting *Arctic Cat Inc. v. Bombardier Rec. Prods.*, 876 F.3d 1350, 1360-61 (Fed. Cir. 2017); *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1069 (Fed. Cir. 2012)).

In an *inter partes* review, it is the petitioners' "burden to demonstrate that the skilled artisan would have had a reasonable expectation of success in combining references." *Id*. (quoting *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367-68 (Fed. Cir. 2016); *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012)).

This Court has expressly held that the Board's decision is erroneous where it assigns no burden as to the reasonable expectation of success to the petitioner and makes no finding as to that issue. *KEYnetik*, 841 F. App'x at 227 ("The Board erred in assigning no burden to Samsung and making no finding as to reasonable expectation of success in combining the contested references.").

The Board's failure to meaningfully hold petitioners to their burden of demonstrating a reasonable expectation of success, and its failure to make any substantive finding as to that core obviousness requirement, is particularly significant here in view of Appellant's express arguments and evidence on that issue. Appx1160-1163, Appx3728-3729. For instance, Appellant demonstrated that petitioners did not explain ***how*** Wada's ADV signal could be "force[d] . . . to a high state during the duration of the burst," Appx3728 (emphasis added), or how the modified system would "handle overflows of data when the burst output produces more data than can be consumed by the receiving device." *Id.* And Appellant further explained that petitioners' proposal to stop Wada's clock was self-defeating, as it would "pause operation of Wada's system, because synchronous (i.e., clocked) systems need a clock to operate," and in any case, "would not result in an uninterruptible burst output, because without a clock, there would be no burst output to interrupt." *Id.*

44

The Board did not substantively address those issues or hold petitioners to their burden of demonstrating a reasonable expectation of success in modifying Wada to arrive at the claimed invention. Appx21. Instead, the Board effectively ended its obviousness analysis at finding that the prior art disclosed a "desire" to render a burst non-interruptible. Appx21-22.

But as this Court has repeatedly held, "knowledge of the goal does not render its achievement obvious." *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1352 (Fed. Cir. 2008); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371, 1377 (Fed. Cir. 2004) ("Recognition of a need does not render obvious the achievement that meets that need. . . . Recognition of an unsolved problem does not render the solution obvious."). Thus, where the prior art merely "recite[s] a goal without teaching *how* the goal is attained," it cannot establish that an ordinary artisan would have had a reasonable expectation of success in arriving at the claimed invention. *Endo Pharm., Inc. v. Actavis LLC*, 922 F.3d 1365, 1376 (Fed. Cir. 2019) (emphasis added). Stated otherwise, evidence of a "desire" for the claimed invention is not "evidence that skilled artisans would have known how to achieve it." *Eurand, Inc. v. Mylan Pharms., Inc. (In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.)*, 676 F.3d 1063, 1074 (Fed. Cir. 2012); *Regeneron Pharm., Inc. v. Merus N.V.*, 864 F.3d 1343, 1371

(Fed. Cir. 2017) ("a 'motivation' to solve a known scientific problem is not a teaching of how to achieve that solution").

The Board's decision should therefore be reversed for failing to make a substantive finding as to the reasonable expectation of success, and for lack of substantial evidence to support that requirement.

Moreover, the Board's decision likewise fails to meet the related requirement that an obviousness combination must be enabled. *Raytheon Techs. Corp. v. GE*, 993 F.3d 1374, 1380 (Fed. Cir. 2021) ("To render a claim obvious, the prior art, taken as a whole, must enable a skilled artisan to make and use the claimed invention."). Notably, a prior art combination must enable the claimed invention, not simply its own disclosures. *In re Kumar*, 418 F.3d 1361, 1369 (Fed. Cir. 2005) ("To render a later invention unpatentable for obviousness, the prior art must enable a person of ordinary skill in the field to make and use the later invention.").

Here, the Board found that it was not relying on any technical teachings from Barrett as part of the combination with Wada, but that instead the "proposed combination includes *only* the particular *desire* to prohibit interruptions within Wada's bursts." Appx22 (emphasis added). As noted, however, achieving that purported "desire" in Wada would have at least required some modification to Wada's requirement that the external signal ADV be maintained High in order for

46

internal address signals to generate. Appx13, Appx19. As Appellant pointed out,

petitioners provided no evidence or explanation as "how Wada's control circuit

would have been modified, e.g., through a hardware or software modification, to

accommodate the revised control circuit that generates a different ADV signal

based on the same inputs," "how to handle overflows of data when the burst output

produces more data than can be consumed by the receiving device," or how

stopping Wada's clock could have allowed the generation of any bursts at all.

Appx3728-3729. Despite the fact that Appellant put those issues in dispute, the

Board made no finding as to how any specific modification to Wada would have

enabled an ordinary artisan to achieve the "non-interruptible" limitation of the

challenged claims. Instead, the Board's decision simply jumped to the conclusion

that the unspecified "required modification would have been well within the

ordinary skill in the art." Appx21. Such conclusory findings cannot suffice.

*ActiveVideo*, 694 F.3d at 1327-28; *TQ Delta*, 942 F.3d at 1361 (citing *KSR*, 550

U.S. at 418, 421; *ActiveVideo*, 694 F.3d at 1327-28; *DSS Tech. Mgmt., Inc. v.

Apple Inc.*, 885 F.3d 1367, 1374-77 (Fed. Cir. 2018); *In re Van Os*, 844 F.3d 1359,

1361-62 (Fed. Cir. 2017); *InTouch Techs., Inc. v. VGo Commc'ns, Inc.*, 751 F.3d

1327, 1349 (Fed. Cir. 2014)). The Board's decision is thus not supported by

substantial evidence of obviousness for that additional reason.

***Third***, the Board's reliance on the '134 patent's teachings and the testimony of Appellant's expert regarding those teachings was legal error and cannot provide substantial evidence of a reasonable expectation of success or enablement.

This Court's recent decision in *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 162 (Fed. Cir. 2021), is instructive. There, the appellee-petitioner sought to support the Board's finding of a reasonable expectation of success based on the disclosure of the challenged patent itself. *Id.* at 165.

This Court flatly rejected that approach, holding that "the inventor's own path itself ***never*** leads to a conclusion of obviousness; that is hindsight. What matters is the path that the person of ordinary skill in the art would have followed, as evidenced by the pertinent prior art." *Id.* (emphasis added) (quoting *Otsuka Pharm, Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1296 (Fed. Cir. 2012)).

This Court then found that the Board's finding of reasonable expectation of success rested on "pure conjecture coupled with hindsight reliance on the teachings in the [challenged] patent," *Univ. of Srathclyde,* 17 F.4th at 162, and reversed the Board's obviousness determination on that basis. *Id.* at 165-66.

This Court likewise reached the same conclusion under the same governing principles in *TQ Delta, LLC v. Cisco Sys.*, 942 F.3d 1352, 1362 (Fed. Cir. 2019). There, petitioner and its expert alleged that the proposed combination "would have been a relatively simple and obvious solution." *Id.* at 1361-62. In support,

petitioner's expert relied on the disclosure of the patent-in-suit. *Id.* at 1362. This Court reversed the Board's obviousness determination, *id.* at 1363, finding that the expert testimony that the Board had relied upon "ultimately fails to resist the temptation to read into the prior art the teachings of the invention in issue." *Id.* at 1362 (quoting *Graham v. John Deere Co.,* 383 U.S. 1, 36 (1966)).

The Board's decision here runs afoul of those precedents. Rather than identifying "the path that the person of ordinary skill in the art would have followed, as evidenced by the pertinent prior art," the Board erroneously relied on "the inventor's own path" to find a reasonable expectation of success in arriving at the challenged claims. *Univ. of Strathclyde*, 17 F.4th at 165; Appx 21. That was error, and "***never*** leads to a conclusion of obviousness." *Univ. of Strathclyde*, 17 F.4th at 165 (emphasis added). The '134 patent's own teachings are not evidence that an ordinary artisan would have known, *prior* to the '134 patent's disclosure, how to modify Wada's deliberately interruptible logic circuit to arrive at the non-interruptible fixed length burst generation of the '134 patent.

The Board's reliance on the testimony of Appellant's expert regarding the '134 patent's teachings only further proves that reality, and does not support the Board's decision. *See* Appx21 (citing Appx3554-3560 (153:24-159:2)). Throughout the passages the Board cited from Appellant's expert testimony, Dr. Brogioli testified regarding what an ordinary artisan would have understood after

*reading* the '134 patent, *i.e.*, *in view of the teachings of the '134 patent*. Appx3556-3557 (155:25-156:17) (testifying that "someone of skill in the art could look at the language of column 3 at roughly 33 [of the '134 patent]" and understand "I need to make a circuit that kind of reads that thing in and puts out a number of BURST_CLKs" and "would know how to do that" even though the concept of using a pulses programmed into a BURST_CLK to achieve non-interruptible fixed length bursts would ***not*** have been obvious to the ordinary artisan); Appx3556 (155:10-14) ("I'm not saying that the BURST counter signaling, and et cetera, of figure 2 as part of figure 1 in the invention was obvious, no."). His testimony is thus not evidence that an ordinary artisan would have known, *from the prior art*, how to modify Wada's logic circuit to arrive at the claimed invention with a reasonable expectation of success. Indeed, Dr. Brogioli expressly testified across multiple pages that an ordinary artisan would ***not*** have known how to modify Wada in view of Barrett to arrive at the "non-interruptible" limitation with a reasonable expectation of success. Appx1269, Appx1293-1299.

***Fourth***, the Board's finding that "the '134 patent contains no detail about how its circuit renders a burst non-interruptible," Appx21, is not only irrelevant for the reasons above, it is also factually erroneous, and contradicted by the Board's own findings. The Board itself sought to rely on the '134 patent's teaching that a predetermined number of pulses programmed into a BURST_CLK signal can be

used in conjunction with the '134 patent's non-interruptible burst counter design to generate a fixed length burst without external interruption. Appx21. Yet the Board made no finding that such knowledge existed in the prior art, and neither Wada nor Barrett provided such evidence.

Accordingly, the Board's finding of obviousness in IPR2020-00985 based on Wada modified in view of Barrett is not supported by substantial evidence, and should be reversed.

## III. The Board's conclusion of anticipation based on Schaefer is directly contradicted by Schaefer's extensive teachings, and is erroneous

### A. The Board's decision rests on finding that AUTO-PRECHARGE renders Schaefer's *entire* burst non-interruptible

In IPR2020-01492, the Board found challenged claims 1-7 and 9-21 of the '134 Patent to be anticipated by U.S. Pat. 5,600,605 ("Schaefer").

Schaefer discloses a "synchronous dynamic random access memory (SDRAM)" that purports to reduce the amount of time needed to activate and "precharge" a row of storage cells in an SDRAM memory bank in between burst operations. Appx8-9, Appx5246. Schaefer teaches that a typical SDRAM requires two separate commands "for accessing and precharging a row of storage cells in the SDRAM memory array." Appx9 (quoting Appx4561 (1:33-35)). The precharge operation "deactivate[s] and precharge[s] a previously accessed memory bank ar[ra]y" and may result in wasted time between read and write operations. Appx9.

As an alternative to issuing a precharge command, Schaefer discloses the option of using an AUTO-PRECHARGE command that "permits a user to program a READ command or WRITE command that automatically performs a precharge upon the completion of the READ command or the WRITE command." Appx4564 (7:32-40).

Petitioner Qualcomm Inc. ("Qualcomm") relied on Schaefer's AUTO-PRECHARGE command to argue that Schaefer discloses a non-interruptible read or write burst operation when a read or write command is issued with the AUTO-PRECHARGE option selected. Appx4012, Appx4029-4032. In particular, the Petition provided the following annotated version of Schaefer's Fig. 4, through which Petitioner alleged that when a read or write command is issued with the AUTO-PRECHARGE option (at time $t_2$ below), the resulting internal address signal generation becomes non-interruptible from $t_2$ to $t_9$.



**FIG. 4**

Appx4030.

Appellant, by contrast, demonstrated that in the context of read or write commands issued with AUTO-PRECHARGE, Schaefer only discloses prohibiting interruptions ***during the precharge period from $t_6$ to $t_9$*** (shown in green highlighting above), but otherwise permits interruptions from ***$t_2$ to $t_6$,*** just as Schaefer does with read and write commands issued with a manual precharge. Appx5261-5284, Appx5339-5359, Appx5596-5612.

In particular, Appellant demonstrated that it was ***undisputed*** that Schaefer ***allows interruptions*** to at least bursts issued without the AUTO-PRECHARGE option. Appx5263, Appx5246 (118:14-22) (admission of Petitioner's expert).

Appellant also established, through the testimony of Petitioner's own expert, that Schaefer allows burst interruptions in order "***to avoid wasting cycles within the device***." Appx5266-5267 (quoting Appx5420 (94:7-95:4)). And Appellant further proved, again through the testimony of Petitioner's own expert, that "***Schaefer is directed to eliminating [ ] wasted clock cycles***" that occur due to typical SDRAM operations. Appx5250 (quoting Appx5424 (110:19-111:1)), Appx4561 (1:53-54) (stating that the goal of Schaefer's invention was to "eliminate possible wasted clock cycles between random READS and writes in a SDRAM."), Appx5330-5331. Moreover, Appellant showed that Schaefer expressly states that the problem of wasted time ***also applies*** to read or write commands ***issued with AUTO-PRECHARGE***. Appx5250 (quoting Appx4565 (9:16-21) (Schaefer stating that in "either a READ command or WRITE command with either a PRECHARGE command ***or an AUTO-PRECHARGE*** command following the READ or WRITE command, the above-described problem of too much total time between the addition of t$_{RP}$ and t$_{RCD}$ may result in an additional wait cycle.")).

Accordingly, Appellant explained that Schaefer never describes or discloses any bursts that are non-interruptible for their ***entire length***, as the claims require, even in the context of read or write commands issued with AUTO-PRECHARGE. Appx5261-5284, Appx5339-5359, Appx5596-5612.

Rather, Appellant demonstrated based on Schaefer's own text and the testimony of both experts that allowing interruptions during bursts is necessary and critical to Schaefer's goal of avoiding wasted clock cycles, even in the context of AUTO-PRECHARGE. *Id.* As Appellant explained, the AUTO-PRECHARGE option only prevents interruptions ***during the precharge period***, ***from $t_6$ to $t_9$***, when Schaefer performs a precharge operation initiated by either an AUTO-PRECHARGE or precharge command, to avoid data corruption. *Id.*

Qualcomm acknowledged that the parties' dispute centered on whether Schaefer's AUTO-PRECHARGE prevents interruptions beginning at time $t_2$ in Fig. 4, as Qualcomm argued, or at time $t_6$, as Appellant stated. Appx5492 ("The only dispute between the parties is whether this prohibition is limited to 'during tRP,' as PO asserts, or from the issuance of the user command at T2, as Petitioner asserts."), Appx5499 ("The only relevant question here is whether Schaefer's disclosure of user interrupt commands apply to a fixed length burst ***with AUTO-PRECHARGE***.") (emphasis Qualcomm's).

In its final written decision, the Board correctly identified the parties' dispute as "whether Schaefer's prohibition on user commands begins with the issuance of a read or write command using the AUTO-PRECHARGE option (time $t_2$ in Figure 4) as Petitioner contends, or instead begins only when the resulting

precharge operation begins (time $t_6$ in Figure 4) as Patent Owner contends."

Appx44-45.

The Board sided with Petitioner on that issue, finding that Schaefer teaches

"prohibition of user commands from the time a fixed-length burst is initiated with

AUTO-PRECHARGE selected," *i.e.*, at time $t_2$ in Figure 4. Appx47, Appx45. On

that basis, the Board found that Schaefer discloses non-interruptible internal

address generation. Appx48.

## B.    The Board's decision is erroneous because Schaefer's own teachings and the evidence contradict the Board's assumptions

The Board's finding that Schaefer discloses a non-interruptible burst in the

context of the AUTO-PRECHARGE feature rests on the Board's interpretation of

the following sentence from Schaefer: "[t]he user is not allowed to issue another

command until the precharge time ($t_{RP}$) is completed." Appx45, Appx47,

Appx4564 (7:42-44).

Qualcomm argued that that sentence should be read to preclude "another

command" after the read or write command issued at time $t_2$ in Figure 4. Appellant

explained that that sentence, in the context of the surrounding text and Schaefer's

teaching as a whole, precludes issuing "another command" once the precharge

operation begins at time $t_6$ in Figure 4, but does ***not*** preclude burst interruptions

prior to time $t_6$. Appx5595-5601.

To interpret that sentence, the Board began with the premise that "*another* command refers to any user command other than or in addition to ***the user command that initiated a burst address generation*** (e.g., READ at time $t_2$ in Figure 4)." Appx45 (emphasis added). Thus, the Board assumed that when Schaefer stated "[t]he user is not allowed to issue *another* command," Schaefer was referring to the time beginning from the last ***user*** command, *e.g.*, a read command at time $t_2$ in Figure 4. Indeed, the Board expressly made its assumption clear, finding that "the statement that a 'user is not allowed to issue another command' connects the prohibition to the last issued ***user command***, which is the READ or WRITE command with AUTO-PRECHARGE." Appx47 (emphasis added).

Based on that crucial premise, the Board concluded that Schaefer's statement that "[t]he user is not allowed to issue *another* command until the precharged time ($t_{RP}$) is completed" necessarily means that Schaefer precludes interruptions beginning at $t_2$, not $t_6$. Appx45, Appx47.

The fundamental premise underlying the Board's decision, however, was incorrect, as Schaefer itself teaches. Although the Board ***characterized*** Schaefer as stating that "when a READ or WRITE command is issued with the AUTO-PRECHARGE feature, '[t]he user is not allowed to issue *another* command until the precharged time ($t_{RP}$) is completed,'" Appx45, ***that is not what Schaefer says***.

In particular, Schaefer never states that it is the ***user's command*** of issuing a read or write with the AUTO-PRECHARGE option that triggers the prohibition on issuing "another command."

Rather, Schaefer states: "The ***AUTO-PRECHARGE command*** insures that the precharge is initiated at the earliest, valid stage within a burst cycle. The user is not allowed to issue ***another command*** until the precharged time ($t_{RP}$) is completed. Therefore, ***when an AUTO-PRECHARGE command is employed*** in SDRAM 20, the selected bank memory array must not be accessed again until $t_{RP}$, is complete." Appx4564 (7:40-47) (emphasis added).

Thus, in ***both*** of the sentences immediately surrounding the key sentence at issue, Schaefer refers to the "AUTO-PRECHARGE ***command***" as the immediately preceding command, ***not*** a user read or write command. Accordingly, the only reasonable interpretation is that the "AUTO-PRECHARGE command" is the ***last command*** after which Schaefer prohibits "***another command***."

Schaefer's text thus raises the question of whether "the AUTO-PRECHARGE command" is a command that issues ***with*** the read or write command at time $t_2$ in Figure 4, or at some time ***after*** time $t_2$ in Figure 4.

Schaefer expressly answers that question, and forecloses the Board's finding. Schaefer states: "***at time $t_6$ the AUTO-PRECHARGE command is internally performed***." Appx4564 (8:65-9:1).

Schaefer then repeats that same teaching a *second* time, stating: "In one embodiment of the invention, indicating circuitry 80 is implemented with a time out circuit which begins timing from the beginning of the PRECHARGE *or AUTO-PRECHARGE command* such at *time $t_6$* and based on an internal timer." Appx4565 (9:60-65) (emphasis added).

Schaefer thus expressly states, repeatedly, that the AUTO-PRECHARGE command occurs *after* time $t_2$ in Figure 4, and specifies that it occurs at time $t_6$, exactly as Appellant had demonstrated below. Thus, Schaefer's prohibition against "another command" after the *AUTO-PRECHARGE command* necessarily refers to the point in time beginning at time $t_6$ in Figure 4.

That understanding makes perfect sense in the context of Schaefer's two crucial sentences, which first focus on the time when the *precharge* "is initiated" using the AUTO-PRECHARGE command, and then state that another command cannot be issued until the precharge "is completed." Appx4564 (7:40-44) ("The AUTO-PRECHARGE command insures that the *precharge is initiated* at the earliest, valid stage within a burst cycle. The user is not allowed to issue another command until the *precharged time ($t_{RP}$) is completed*.") (emphasis added).

There is no dispute that the precharge is initiated at time $t_6$ in Figure 4, not time $t_2$. Thus, Schaefer's text once again teaches that the non-interruptible period

begins when precharge is initiated, at time $t_6$, and ends when precharge is completed, at time $t_9$.

Schaefer's other teachings regarding the "AUTO-PRECHARGE command" all further support the conclusion that the "AUTO-PRECHARGE command" occurs *after* the read or write command at time $t_2$, not ***at the same time*** as those commands. Specifically, Schaefer discloses:

- "an AUTO-PRECHARGE command *following* a READ command," Appx4561 (2:50-53) (emphasis added);

- "a command signal which determines whether or not an AUTO-PRECHARGE command . . . is to be initiated automatically *after* the READ command." Appx4562 (4:53-56) (emphasis added);

- "the additional feature to select whether or not the below described AUTO-PRECHARGE command is to be initiated *following* the WRITE command." Appx4563 (5:28-33) (emphasis added);

- "FIG. 4 is similar to FIG. 2 except ***at time $t_6$*** the AUTO-PRECHARGE command is internally performed. A similar modification could be made to FIG. 3 to illustrate an AUTO-PRECHARGE command *following* a WRITE command." Appx4564-4565 (8:61-9:4) (emphasis added);

- "an AUTO-PRECHARGE command *following* the READ or WRITE command," Appx4565 (9:16-22) (emphasis added).

60

Moreover, Schaefer's claims likewise further evidence that the AUTO-PRECHARGE command issues *after* the read or write commands. In particular, Schaefer's dependent claim 24 recites: "The method of claim 23 further comprising the step of automatically initiating an ***auto-precharge command in place of the precharge command*** based on the transfer command ***being initiated*** and the state of a command signal bit." Appx4566 (emphasis added). Claim 23 further specifies that "the transfer command is a ***write*** command such that data is written into the memory array in the transferring step." Appx4566 (emphasis added). Thus, once again, Schaefer's claims disclose that the auto-precharge command initiates (1) at the same time as the precharge command would have (*i.e.*, at time $t_6$) and (2) after the write command (*i.e.*, after time $t_2$).

In sum, Schaefer expressly teaches, repeatedly, that the AUTO-PRECHARGE command only begins at time $t_6$, and thus Schaefer only prohibits "another command" from time $t_6$. There is thus no evidence that Schaefer teaches prohibiting interruptions throughout an entire burst, and thus Schaefer does not disclose a burst that is "non-interruptible" as the claims require.

Evidence from *both* experts further supports that conclusion, namely:

- Schaefer ***allows interruptions*** to at least bursts issued without AUTO-PRECHARGE, Appx5263, Appx5246 (118:14-22) (admission of Petitioner's expert);

61

- Schaefer allows those burst interruptions "*to avoid wasting cycles within the device*," Appx5266-5267 (quoting Appx5420 (94:7-95:4));

- "*Schaefer is directed to eliminating [ ] wasted clock cycles*" that occur due to typical SDRAM operations, Appx5250 (quoting Appx5424 (110:19-111:1)), Appx4561 (1:53-54), Appx5330-5331; and

- Schaefer expressly states that the problem of wasted time *also applies* to read or write commands *issued with AUTO-PRECHARGE*. Appx5250 (quoting Appx4565 (9:16-21).

Accordingly, Schaefer's teaching that its bursts are interruptible from time $t_2$ to $t_6$ applies equally to bursts with AUTO-PRECHARGE, which is consistent with Schaefer's design goals and express teachings.

The Board's finding that "additional evidence" supports its conclusion, Appx47, cannot show otherwise. That finding was expressly directed to "fixed-length burst operations *with* the AUTO-PRECHARGE option selected." *Id.* (emphasis added). Thus, it was again grounded in whether AUTO-PRECHARGE prevents interruptions beginning at time $t_2$. As shown, Schaefer expressly says it does not, and the Board could not reasonably find otherwise. Moreover, the Board's "additional evidence" was only that "Schaefer *does not discuss* user-issued burst-terminate commands in the context of fixed-length burst commands."

Appx47 (emphasis added). But Schaefer's purported *silence* as to whether a fixed-length is interruptible is not evidence that Schaefer *teaches* a fixed-length burst that is *non-interruptible*. Schaefer's silence weighs only against Qualcomm and the Board, not in favor of anticipation.

Because Schaefer's express teachings refute the Board's finding that Schaefer discloses a "non-interruptible" burst as part of its AUTO-PRECHARGE feature, the Board's conclusion of anticipation should be reversed. *Applications in Internet Time, LLC v. RPX Corp.*, 897 F.3d 1336, 1356 (Fed. Cir. 2018) ("[S]ubstantial evidence review requires an examination of the record as a whole, taking into account both the evidence that justifies and detracts from an agency's opinion."); *id.* at 1353 ("The Board's selective weighing of the record evidence does not pass muster under the APA" under substantial evidence review.).

## IV. STMicro was not a party to IPR2020-01492, is not a party to Appeal No. 22-1771, and may not appear as appellee in that appeal

Although this Court ordered that appearances, certificates of interest, and docketing statements in Appeal No. 22-1771 appeal be filed by May 25, 2022, *see* Appeal No. 22-1771, Dkt. 1, STMicro did not make any such filings. STMicro has thus not sought to appear as a party in this appeal, and is not a party to this appeal.

Moreover, STMicro cannot seek to appear as a party to this appeal. STMicro was not a party to IPR2020-01492, from which Appeal No. 22-1771 arises. Rather, STMicro was estopped from participating as a petitioner in

IPR2020-01492. Appx35 ("STM is estopped from challenging patentability of [claims 1-21 of the '134 patent] in this proceeding. Thus, our use of 'Petitioner' in this decision, including the Order below, refers solely to Qualcomm.").

As this Court recently held, where a petitioner is estopped from participating in a later IPR due to its participation in an earlier IPR that led to a final written decision, that petitioner ceases to be a party to the later IPR "effective as of the issuance of the prior written decision." *Intuitive Surgical, Inc. v. Ethicon LLC*, 25 F.4th 1035, 1043 (Fed. Cir. 2022).

35 U.S.C. § 319 provides that when a party to an *inter partes* review files an appeal to this Court, "[a]ny *party* to the inter partes review shall have the right to be a party to the appeal." It conversely follows that as a ***non-party*** to IPR2020-01492, STMicro has no right to appear as a party in Appeal No. 22-1771.

That conclusion is especially compelled by the fact that STMicro was *estopped* from participating in IPR2020-01492 under 35 U.S.C. § 315(e). It would be inconsistent with the purpose of the estoppel provision to allow STMicro to argue, on appeal, against the validity of the '134 patent on the basis of art and arguments that only arose in IPR2020-01492, when STMicro was estopped from advancing that art and those arguments in the proceeding below.

Accordingly, STMicro should not be permitted to appear as a party in Appeal No. 22-1771 or to advance arguments in support of the Board's decision in that appeal.

## CONCLUSION

For the reasons set forth above, this Court should reverse the Board's decisions of unpatentability in both IPR2020-00985 and IPR2020-01492. Because the Board's findings as to Wada establish that Wada alone cannot anticipate or render the challenged claims obvious, this Court should not remand in IPR2020-00985. Moreover, there is also no need or basis for a remand in IPR2020-01492, particularly as there is no petitioner remaining in that proceeding.

Respectfully submitted,

*/s/ Kayvan B. Noroozi*
Kayvan B. Noroozi
NOROOZI PC
11601 Wilshire Blvd., Ste. 2170
Los Angeles, CA 90025
Telephone: (310) 975-7074
Facsimile: (844) 975-7074

*Counsel for Appellant*

# **<u>ADDENDUM</u>**

*IPR2020-00985 Final Written Decision—Appx1*

*IPR2020-01492 Final Written Decision—Appx34*

*U.S. Pat. 6,651,134—Appx53*

Trials@uspto.gov                                    Paper No. 31
571-272-7822                              Date: November 30, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

ADVANCED MICRO DEVICES, INC.,
STMICROELECTRONICS, INC.,
Petitioners,

v.

MONTEREY RESEARCH, LLC,
Patent Owner.

_____

IPR2020-00985[1]
Patent 6,651,134 B1

_____

Before KRISTEN L. DROESCH, JOHN F. HORVATH, and
JASON W. MELVIN, *Administrative Patent Judges.*

MELVIN, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

_____

[1] STMicroelectronics, Inc., which filed a petition in IPR2021-00355, has
been joined as a party to this proceeding.

IPR2020-00985
Patent 6,651,134 B1

# I.    INTRODUCTION

## A.    BACKGROUND

Advanced Micro Devices, Inc., ("AMD") filed a Petition (Paper 1, "Pet.") requesting institution of *inter partes* review of claims 1–21 ("the challenged claims") of U.S. Patent No. 6,651,134 B1 (Ex. 1001, "the '134 patent"). Monterey Research, LLC, ("Patent Owner") filed a Preliminary Response. Paper 9. After our email authorization, Petitioner filed a Preliminary Reply (Paper 10) and Patent Owner filed a Preliminary Sur-Reply (Paper 11). We instituted review. Paper 13 ("Institution Decision" or "Inst.").

After we instituted review, STMicroelectronics, Inc. ("STM") was joined as a Petitioner to this proceeding. Paper 23. Thus, AMD and STM are, collectively, the "Petitioner." Patent Owner filed a Response. Paper 19 ("PO Resp."). Petitioner filed a Reply. Paper 21 ("Pet. Reply"). Patent Owner filed a Sur-Reply. Paper 22 ("PO Sur-Reply"). We held a hearing on September 1, 2021, and a transcript appears in the record. Paper 30 ("Tr.").

This is a final written decision as to the patentability of the challenged claims. For the reasons discussed below, we determine Petitioner has shown by a preponderance of the evidence that claims 1–21 of the '134 patent are unpatentable.

## B.    REAL PARTIES IN INTEREST

AMD identifies itself and ATI Technologies ULC as the real parties in interest. Pet. 3. STM identifies itself, a related company under common ownership, STMicroelectronics International N.V., and their parent company, STMicroelectronics N.V., as real parties in interest. IPR2021-

IPR2020-00985
Patent 6,651,134 B1

00355, Paper 1, 3. Patent Owner identifies itself and IPValue Management as real parties in interest. Paper 5, 1.

### C.  RELATED MATTERS

The parties identify the following matters related to the '134 patent: *Monterey Research, LLC v. Qualcomm Inc.*, No. 1:19-cv-02083-NIQA-LAS (D. Del.); *Monterey Research, LLC v. Nanya Tech. Corp.*, No. 1:19-cv-02090-NIQA-LAS (D. Del.); *Monterey Research, LLC v. Advanced Micro Devices Inc.*, No. 1:19-cv02149-NIQA-LAS (D. Del.); *Monterey Research, LLC v. STMicroelectronics N.V.*, No. 1:20-cv-00089-NIQA-LAS (D. Del.); *Monterey Research, LLC v. Marvell Tech. Grp. Ltd.*, No. 1:20-cv-00158-NIQA-LAS (D. Del.); and *Marvell Semiconductor, Inc. v. Monterey Research, LLC*, No. 3:20-cv-03296 (N.D. Cal.). Pet. 3; Paper 5, 1.

The parties identify two additional adjudications, now complete, which involved the '134 patent: *In the matter of: Certain Static Random Access Memories and Products Containing Same*, Inv. No. 337-TA-792 (ITC); and *Cypress Semiconductor Corp. v. GSI Tech., Inc.*, No. 3:13-cv-02013-JST and No. 3:13-cv-03757-JST (N.D. Cal). Pet. 3; Paper 5, 1–2.

### D.  THE '134 PATENT

The '134 patent is titled Memory Device with a Fixed Length Non Interruptible Burst. Ex. 1001, code (54). The patent discloses that "the data burst transfers of conventional memories can be interrupted and single access made," and proposes a memory device "that has a fixed burst length." *Id.* at 1:37–45.

IPR2020-00985
Patent 6,651,134 B1

Figure 1 is reproduced below:



**FIG. 1**

Ex. 1001, Fig. 1. Figure 1 depicts circuit 100 configured as a fixed burst memory, in which circuit 102 accepts external signals including external address signal ADDR_EXT, and "generate[s] the signal ADDR_INT as a fixed number of addresses in response to the signal CLK." *Id.* at 3:21–22. The '134 patent states that "[o]nce the circuit 102 has started generating the fixed number of addresses, the circuit 102 will generally not stop until the fixed number of addresses has been generated (e.g., a non-interruptible burst)." *Id.* at 3:25–28.

The '134 patent depicts two embodiments for circuit 102, in Figures 2 and 3. Figure 2 is reproduced below:

IPR2020-00985
Patent 6,651,134 B1



**FIG. 2**

*Id.* Fig. 2. Figure 2 shows burst counter 128 receiving signal CLK (a clock signal), signal ADV, and signal BURST, and providing signal BURST_CLK. "When the signal ADV is asserted, the burst counter 128 will generally present the signal BURST_CLK in response to the signal CLK. The signal BURST_CLK generally contains a number of pulses that has been programmed by the signal BURST." *Id.* at 4:10–14. Figure 3 and the associated description disclose an alternative circuit, in which "counter 138 may be configured to generate a number of addresses in response to the signals CLK, BURST[,] and ADV" and where "[t]he number of addresses generated by the counter 138 may be programmed by the signal BURST." *Id.* at 4:29–31. The '134 patent describes more generally that, "[w]hen the signal ADV is asserted, the circuit 100 will generally generate a number of address signals" and that "[t]he address signals will generally continue to be generated until the Nth address signal is generated." *Id.* at 4:42–48.

IPR2020-00985
Patent 6,651,134 B1

### E.   CHALLENGED CLAIMS

Challenged claim 1 is reproduced below:

1.   A circuit comprising:

> a memory comprising a plurality of storage elements each configured to read and write data in response to an internal address signal; and

> a logic circuit configured to generate a predetermined number of said internal address signals in response to (i) an external address signal, (ii) a clock signal and (iii) one or more control signals, wherein said generation of said predetermined number of internal address signals is non-interruptible.

Ex. 1001, 5:22–32. Independent claim 16 recites limitations similar to those of claim 1, expressed as means-plus-function elements. *Id.* at 6:20–30. Independent claim 17 recites limitations similar to those of claim 1, expressed as a "method of providing a fixed burst length data transfer." *Id.* at 6:31–39. Claims 2–15 depend, directly or indirectly, from claim 1. *Id.* at 5:33–6:19. Claims 18–21 depend, directly or indirectly, from claim 17. *Id.* at 6:40–48.

### F.   PRIOR ART AND ASSERTED GROUNDS

Petitioner asserts the following grounds of unpatentability:

| Claim(s) Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1–3, 8, 12, 13, 16, 17 | 102 | Wada[2] |
| 1–4, 8, 12–14, 16, 17 | 103 | Wada |
| 1–4, 8, 12–14, 16, 17 | 103 | Wada, Barrett[3] |

---

[2] U.S. Patent No. 6,115,280 (Ex. 1005).
[3] U.S. Patent No. 5,584,033 (Ex. 1010).

IPR2020-00985
Patent 6,651,134 B1

| Claim(s) Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 4–7, 18–20 | 103 | Wada, Fujioka[4] |
| 4–7, 18–20 | 103 | Wada, Barrett, Fujioka |
| 9–10, 14, 21 | 103 | Wada, Reeves[5] |
| 9–10, 14, 21 | 103 | Wada, Barrett, Reeves |
| 11, 15 | 103 | Wada, Lysinger[6] |
| 11, 15 | 103 | Wada, Barrett, Lysinger |

Pet. i–iii, 5. Petitioner relies also on the Declaration of R. Jacob Baker, Ph.D., P.E. Ex. 1002.

## II.    ANALYSIS

### A.    LEVEL OF ORDINARY SKILL IN THE ART

Petitioner proposes that a person of ordinary skill "would have had a bachelor's degree in electrical or computer engineering, applied physics, or a related field, and at least two years of experience in design, development, and/or testing of memory circuits, related hardware design, or the equivalent, with additional education substituting for experience and vice versa." Pet. 11 (citing Ex. 1002 ¶ 43). Patent Owner does not dispute this definition of a person of ordinary skill. *See generally* PO Resp. We adopt Petitioner's proposed level of ordinary skill as it is consistent with the level of skill reflected in the specification and in the asserted prior art references.

---

[4] U.S. Patent No. 6,185,149 (Ex. 1006).
[5] U.S. Patent No. 6,226,755 (Ex. 1008).
[6] U.S. Patent No. 5,748,331 (Ex. 1009).

IPR2020-00985
Patent 6,651,134 B1

B.   CLAIM CONSTRUCTION

In *inter partes* reviews, we interpret a claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2019). Under this standard, a claim is construed "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." *Id.* Only claim terms which are in controversy need to be construed and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

*1.   "non-interruptible"*

As to "non-interruptible," Petitioner submits that the prior art discloses the claim elements under the following construction adopted by the parties in an International Trade Commission (ITC) investigation—"cannot be stopped or terminated once initiated until the fixed number of internal addresses has been generated." Pet. 12 (citing Ex. 1011, 12–13). We adopted that construction in the Institution Decision. Inst. 8–9. Patent Owner agrees with that construction (PO Resp. 21), and we apply it here.

One dispute in this proceeding relates to whether the prior art discloses a non-interruptible burst; specifically, whether the need to maintain an external control signal prevents a burst from being "non-interruptible." We stated in the Institution Decision that the agreed construction would not encompass "a circuit in which burst operation depends on external control." Inst. 18. Patent Owner relies on that view of the claim scope to argue that the claim excludes a system in which an external signal must be maintained in a certain state for a burst to be completed. PO Resp. 28.

IPR2020-00985
Patent 6,651,134 B1

We note that the claim itself requires certain external signals for the claimed address generation. Claim 1 recites a logic circuit configured to generate address signals "in response to (i) an external address signal, (ii) a clock signal and (iii) one or more control signals." Ex. 1001, 5:22–32. Those three recited external signals may influence the circuit's ability to generate internal addresses as claimed. For example, stopping the clock signal or removing power from the circuit would prevent (or interrupt) address generation. *See* Pet. Reply 12; Tr. 19:17–22. Doing so, however, would prevent all operation by the circuit. This, in our view, would not represent an interrupted burst, which we determine requires interruption during continued circuit operation, such as interruption to generate a new burst or to accept another command. Thus, as a matter of logic, the need to maintain the clock signal does not render address generation interruptible.

Further, we agree with Patent Owner that the claimed "external address signal" need only be provided at the beginning of the process, not maintained throughout, for the circuit to generate a burst of address signals. *See* Tr. 54:11–13. As the specification instructs, that external address signal provides an "initial address" to "determine the initial location where data transfers to and from the memory 104 will generally begin." Ex. 1001, 2:66–3:4.

The parties agree that the "one or more control signals" term relates to the ADV signal described in the specification. *See, e.g.*, Tr. 12:19–23, 54:15–18; Ex. 1001, 3:5–6 ("The signal ADV may be, in one example, used as a control signal."). The corresponding signal in the prior art lies at the core of the parties' dispute regarding using control signals to generate address signals without interruption.

The specification describes that "[w]hen the signal ADV is asserted, the circuit 100 will generally begin transferring a predetermined number of words." Ex. 1001, 3:8–10. It states that the "[t]he transfer is generally non-interruptible." *Id.* at 3:10–11. The specification describes also that the ADV signal may be combined with a LOAD signal, which loads the initial address, as the combined ADV/LDb signal. *Id.* at 3:14–15. It states that "[w]hen the signal ADV/LDb is in the first state, the circuit 102 will generally load an address presented by the signal ADDR_EXT as an initial address" and that "[w]hen the signal ADV/LDb is in the second state, the circuit 102 may be configured to generate the signal ADDR_INT as a fixed number of addresses in response to the signal CLK." *Id.* at 3:17–22. Just like the standalone ADV signal, the specification states that, for the combined ADV/LDb signal, "[o]nce the circuit 102 has started generating the fixed number of addresses, the circuit 102 will generally not stop until the fixed number of addresses has been generated (e.g., a non-interruptible burst)." *Id.* at 3:25–28.

Ultimately, we conclude that we need not resolve whether the need to hold the ADV line high to complete a burst renders the burst interruptible and, therefore, is outside the claim scope. As discussed below, Petitioner's assertions regarding Wada and Barrett render the subject matter of the challenged claims obvious even under Patent Owner's view of the claim scope. Accordingly, for purposes of this Decision, we apply Patent Owner's view—that a non-interruptible burst does not require the control signals be maintained in a particular state once a burst begins.

IPR2020-00985
Patent 6,651,134 B1

    2.   *"predetermined number of internal address signals"*

Petitioner states that the ITC expressly construed the term as "a fixed number of internal address signals for a burst access." Pet. 16. Petitioner submits that the ITC further applied the term in a narrower manner, such that it did not read on prior art "fixing the burst length before a data transfer by using a mode register" because that burst length "could be programmed." Pet. 16 (citing Ex. 1013, 24–25). Thus, Petitioner submits that a "predetermined number" under the ITC's construction must be a number determined at manufacture time. *Id.* Thus, Petitioner maps the claims to the prior art asserted here using what it views as the ITC's implied construction—"fixed or programmable at manufacture time using bond options or voltage levels." Pet. 16.

We do not understand any dispute raised by the parties to turn on whether we adopt Petitioner's view that the predetermined number must be fixed at manufacture time. Moreover, such a construction would not appear to be consistent with dependent claim 5, which recites that the "fixed burst length is programmable." Ex. 1001, 5:40–41. Thus, we do not adopt Petitioner's proposed construction and proceed with no express construction for "predetermined number."

    3.   *"means for reading data . . . / means for generating a predetermined number of said internal address signals in response to (i) an external address signal, (ii) a clock signal and (iii) one or more control signals"*

The parties agree that the structure corresponding to the means for reading data is "memory array 104." Pet. 13; PO Resp. 21.

The parties appear to agree that the structure corresponding to the means for generating a predetermined number of internal address signals is

IPR2020-00985
Patent 6,651,134 B1

"burst address counter/register 102," which may take the form shown in either Figure 2 or Figure 3. Pet. 14–15; PO Resp. 21.

We proceed with both proposed constructions.

### C.    OBVIOUSNESS OVER WADA AND BARRETT

Wada discloses a "semiconductor memory for operating in burst mode." Ex. 1005, code (57). Petitioner relies on two aspects of Wada—its description of a first "conventional SRAM" and its "Second Embodiment." *See, e.g.*, Pet. 24–30 (identifying, for each challenged limitation, Wada's disclosures of a "Conventional Embodiment" and "Second Embodiment"). Petitioner submits that it would have been obvious to a skilled artisan "to apply the teachings of Barrett to achieve an uninterruptible data transmission stream." Pet. 52–53 (emphasis omitted).

### 1.    *Wada's disclosures*

Wada's first conventional embodiment is depicted in Figure 12, reproduced below:



IPR2020-00985
Patent 6,651,134 B1

Ex. 1005, Fig. 12. Figure 12 depicts burst counter unit 80 that starts with external address signal EXT.ADD and increments the address to create internal address signal INT.ADD, which is provided to decoder 2 to select word line 11 in memory cell array 1 for reading or writing data. *Id.* at 1:22–2:33, 3:5–32. Wada discloses that "every time the clock signal CLK is at a leading edge and the advance signal ADV is High," the internal address "is incremented by the burst counter." *Id.* at 3:5–9. Wada notes that speed improvement in the conventional embodiment described above is limited by the "operative delays resulting from the parts of the memory cell array" such as "delay times in the operations of the word lines." *Id.* at 5:26–42.

Wada discloses a second conventional SRAM embodiment, depicted in Figure 15, reproduced below:



FIG.15 PRIOR ART

*Id.* Fig. 15. Figure 15 depicts memory cell array 1 where the word line 11 selected for reading or writing is determined by memory address input signal MADD, which is sent to the decoder as internal address signal INT.ADD. *Id.* at 3:33–62. Figure 15 depicts output register 5, which retains data received from memory cell array 1 through sense amplifier 41. *Id.* at 3:42–4:13. Rather than using a burst counter to increment the address identifying a memory word line as in the first conventional embodiment, the second

IPR2020-00985
Patent 6,651,134 B1

conventional embodiment uses burst counter 8 to accept external chunk address signal EXT.CHA and increment it, producing internal chunk address signal INT.CHA, which allows multiplexer 7 to select from one of four blocks, 50 through 53, in output register 5, to provide to data input/output pin 9. *Id.* at 4:6–40.

Wada indicates its second conventional embodiment avoids the operative delays involved in its first conventional embodiment. *Id.* at 5:43–45. Wada notes that the second conventional embodiment has the disadvantage of one clock-cycle delay between two burst outputs relating to two memory addresses. *Id.* at 5:50–53. That delay arises because data must be retained in the output register until output, preventing new data from being captured from the memory cell array. *Id.* at 5:11–24. Thus, Wada proposes an improved approach using burst mode that does not suffer from the operative delays of the conventional embodiment described above or the additional conventional embodiment with "data output interruptions" between bursts associated with different addresses. *Id.* at 5:66–6:7. Wada describes six enumerated embodiments that purport to address deficiencies of the prior art. *Id.* at 12:28–14:52 (First Embodiment), 14:53–16:50 (Second Embodiment), 16:51–18:48 (Third Embodiment), 18:49–19:34 (Fourth Embodiment), 19:35–20:60 (Fifth Embodiment), 20:61–38 (Sixth Embodiment).

Wada's Second Embodiment is depicted in Figure 3, reproduced below:



*FIG.3*

*Id.* Fig. 3. Figure 3 depicts a system sharing most components with Figure 15 (the second conventional embodiment) described above, but using multiple output registers 5A through 5K in place of single output register 5, and using additional multiplexers 60a through 63a to select among the multiple output registers. *See id.* at 14:63–15:2 (describing differences

between the First Embodiment and Second Embodiment), 12:36–13:13
(describing differences between the second conventional embodiment and
the First Embodiment). As with Wada's second conventional embodiment,
its Second Embodiment uses burst counter unit 8 to convert external chunk
address signal EXT.CHA into internal chunk address signal INT.CHA,
which controls which block of the selected output register is transferred to
output pin 9. *Id.* at 15:66–16:3.

Because the Second Embodiment uses multiple output registers, it can
"execute data burst output in uninterrupted fashion." *Id.* at 16:12–15. That is,
it avoids the one clock-cycle delay associated with the single output register
used in the second conventional embodiment. *See id.* at 5:50–53 (describing
that "a data-free period (an interruption in the flow of data output) is bound
to occur between two burst outputs"), 14:28–33 (describing that using two
output registers as in the First Embodiment "permit[s] uninterrupted burst
output of data), 16:12–15 (describing that the Second Embodiment
"provides one advantage identical to that of the first embodiment, i.e., the
ability to execute data burst output in uninterrupted fashion").

### 2.  *Barrett's disclosures*

Barrett discloses "a burst transfer protocol [that] allows pausing only
at pre-determined, fixed intervals of n data words." Ex. 1010, code (57).
Barrett's protocol allows sender or receiver devices to "cause transmission
to pause" only after each burst of data. *Id.* It notes that "[t]he essential
feature of burst communication is that the data transfer takes place at high
speed and without interruption." *Id.* at 1:64–66. Barrett also discloses that,
"[i]n effect, allowing a pause at any point defeats the purpose of burst

transmission, which is to send data a[s] rapidly as possible in an uninterrupted stream." *Id.* at 2:39–41.

Petitioner asserts that Barrett's teachings are applicable to Wada because both are directed to high-speed data exchange. Pet. 51–52. Petitioner asserts that "applying Barrett's teachings to Wada to render bursts uninterruptible would result in improved transmission efficiency by minimizing overhead associated with terminating and initiating packets." *Id.* at 52.

### 3.   *Unpatentability disputes*

Petitioner contends that both the first conventional embodiment and the Second Embodiment of Wada disclose the elements of claim 1. Pet. 24–30. As to the claimed "logic circuit configured to generate a predetermined number of said internal address signals," Petitioner identifies burst counter unit 80 in Wada's first conventional embodiment (Pet. 26) and burst counter unit 8 in Wada's Second Embodiment (Pet. 28). As described above, Wada teaches that those two circuits are "identical in structure" other than being provided with different external address signals. *See* Ex. 1005, 4:18–21 (describing differences between the burst counter unit 80 and burst counter unit 8), 12:36–39 (describing differences between the second conventional embodiment and the First Embodiment, not including any difference in burst counter unit 8), 14:63–15:5 (same, as between the First Embodiment and Second Embodiment), Figs. 1, 2 (showing the First Embodiment and Second Embodiment contain the same burst counter unit 8). Thus, Wada's two embodiments identified by Petitioner for the claimed logic circuit offer no functional difference for our analysis.

IPR2020-00985
Patent 6,651,134 B1

*a.   Non-interruptible address generation*

Patent Owner argues that the identified circuits in Wada do not satisfy the limitation "wherein said generation of said predetermined number of internal address signals is non-interruptible" appearing in each independent claim.[7] PO Resp. 27–33. In each circuit Wada describes, if the ADV signal is not maintained in a high state throughout a burst, the circuit will not continue generating addresses for the burst. *See* Ex. 1005, 2:55–59, 3:5–9. Petitioner, however, asserts a combination in which Wada's system is modified in light of Barrett's teachings to render Wada's system non-interruptible. Pet. 50–53.

Patent Owner challenges whether the combination of Wada and Barrett would result in non-interruptible address generation, arguing that Barrett lacks any disclosure "for preventing the burst transmission from being interrupted by external signals." PO Resp. 35. We do not agree. Barrett discloses that "allowing a pause at any point defeats the purpose of burst transmission, which is to send data a[s] rapidly as possible in an uninterrupted stream." Ex. 1010, 2:39–41. Barrett thus discloses a system in which a device transfers data "in successive cycles, without interruption." *Id.* at 6:8–10; *accord id.* at 3:14–16 ("Once burst transfer is initialized, the sending device transmits an uninterrupted stream of n data transfer cycles over the communications bus."). As to the controlling device's ability to interrupt a burst, Barrett provides that transmission may be paused only "[a]fter a predetermined number of n data transfer cycles, where n is greater

---

[7] Patent Owner argues also that Wada fails to disclose a "predetermined number" of generated addresses. PO Resp. 24–27. We address that argument below in the context of obviousness. *See infra* at 22.

IPR2020-00985
Patent 6,651,134 B1

than one." *Id.* at 3:16–19. Patent Owner points to Barrett's discussion of allowing a pause after a burst, before completing a "data transmission," but the claim language here does not exclude such an approach. Rather, as long as a burst of predetermined length cannot be stopped, the claim is satisfied. We find that, in the above disclosures, Barrett teaches a non-interruptible burst.

### b.    *Combining Barrett and Wada*

Patent Owner argues that skilled artisans would have had no reason to combine Barrett's teachings with Wada to result in the asserted combination. PO Resp. 36–48. Petitioner's case in this regard relies on Barrett's teaching that "allowing a pause at any point defeats the purpose of burst transmission, which is to send data a[s] rapidly as possible in an uninterrupted stream." Ex. 1010, 2:39–41; *see* Pet. 52–53. Petitioner further reasons that "applying Barrett's teachings to Wada to render bursts uninterruptible would result in improved transmission efficiency by minimizing overhead associated with terminating and initiating packets." Pet. 52.

Patent Owner argues that because "Wada is directed to memory burst operation and Barrett is directed to burst data transfers between I/O devices," there would have been no reason to combine their teachings. PO Resp. 37. While Patent Owner identifies differences in the data-transfer rates between the two types of devices, we do not agree those differences overcome Barrett's disclosure of the desirability of precluding burst interruptions. Rather, Barrett's teaching explains an aspect of burst data transfer that Wada leaves silent. Although Wada does not disclose any burst interruption, Wada also does not disclose the desirability of prohibiting burst interruptions. Barrett does. Barrrett discloses that allowing burst

20
Appx20

interruptions is undesirable, thus motivating a skilled artisan to modify Wada's circuit to prohibit such interruptions.

According to Patent Owner, Petitioner's stated motivation does not justify a device that "relinquishes control of the burst output." PO Sur-Reply 12–13. We do not agree. Petitioner explains that there would be a benefit to "minimizing overhead associated with terminating and initiating packets." Pet. 52. Relinquishing control of the burst output, as the consequence of the asserted combination, logically reduces overhead in the overall system—if a burst cannot be stopped, then there is no requirement to determine whether to stop it. Petitioner's stated rationale has a logical basis and would have motivated skilled artisans to modify Wada's circuit to render it non-interruptible.

While Patent Owner complains that Petitioner has not sufficiently explained "how Wada's control circuit would have been modified" (PO Sur-Reply 13; *accord* PO Resp. 48–50 (regarding reasonable expectation of success)), the '134 patent contains no detail about how its circuit renders a burst non-interruptible (*see* Ex. 1001, 3:5–4:48, Figs. 1–3). By treating such details as within the ordinary skill in the art, the '134 patent precludes Patent Owner's argument that Petitioner needed to show additional detail regarding how to implement the asserted combination. Indeed, Patent Owner's declarant agreed that "the reader would understand" the "pulse circuit design" required to generate a certain number of pulses. Ex. 1015, 153:24–159:2. Thus, regardless of the '134 patent's disclosures, the record supports, and we find that the required modification would have been well within the ordinary skill in the art.

IPR2020-00985
Patent 6,651,134 B1

Patent Owner submits further that Barrett operates using asynchronous data transfer whereas Wada uses synchronous, clock-driven transfer. PO Resp. 43–46. Because Barrett's approach allows pauses between successive bursts, Patent Owner contends it is not compatible with Wada's approach of eliminating delay between bursts. *Id.* The claims here do not relate to multiple successive bursts, and Barrett's behavior in that regard is not relevant to whether the prior art discloses the claimed limitations. While it is possible that Barrett's approach would create a problem if implemented in Wada's system, Petitioner's proposed combination does not include Barrett's full approach to controlling data flow, including data flow between bursts. Rather, Petitioner's proposed combination includes only the particular desire to prohibit interruptions within Wada's bursts. *See* Pet. 50–53. Thus, we do not agree that Barrett's teachings that allow for inter-burst pauses would apply in the asserted combination and defeat Wada's ability to permit successive, uninterrupted bursts. *See* PO Resp. 46.

Having reviewed the full record and considered the parties' contentions, we find that skilled artisans would have had reason to modify Wada's circuit in light of Barrett's teachings to render Wada's burst-address generation non-interruptible.

### c.     *Predetermined number of internal address signals*

For Wada's first conventional embodiment, Petitioner asserts that incrementing a k-bit portion of the EXT.ADD provided to burst counter unit 80 means that $2^k$ addresses are generated for INT.ADD, a number predefined by the number of bits separated from an n-bit EXT.ADD for incrementing. Pet. 26–27.

IPR2020-00985
Patent 6,651,134 B1

For Wada's Second Embodiment, Petitioner asserts that "the burst length is fixed by the choice of a four-input multiplexer and the choice of dividing the memory into four blocks (M0-M3)." Pet. 29. Petitioner points out that Wada's Figure 4 shows that the internal chunk address INT.CHA takes on four successive values in response to incrementing the address Ac received as external chunk address signal EXT.CHA. *Id.* (citing Ex. 1005, Fig. 4).

Patent Owner argues that neither of Wada's asserted embodiments discloses generating a predetermined number of internal addresses. PO Resp. 23–27. As to Wada's conventional embodiment, Patent Owner submits that, while it is limited to $2^k$ unique addresses for a given external address, external signals may cause it to stop short of that number, or cause it to generate additional, duplicate, addresses. *Id.* at 24–25; PO Sur-Reply 7. Petitioner points out that Patent Owner's declarant agrees that Wada discloses a burst counter that can generate $2^k$ addresses. Pet. Reply 7 (citing Ex. 1015, 193:16–194:5).

As to Wada's Second Embodiment, Patent Owner argues that "[n]either the number of memory blocks nor the number of multiplexer inputs has any bearing whatsoever on how many INT.CHA signals are generated." PO Resp. 26. Patent Owner relies in part on deposition testimony from Petitioner's declarant. *Id.* (citing Ex. 2006, 91:10–92:1). But that testimony relates to a statement the declarant, Dr. Baker, had written about "burst of data to or from the memory [that] comes from a single bank." Ex. 2006, 90:22–24. That is not the case in Wada, which describes four multiplexers used to transfer data to another multiplexer for a burst output. Ex. 1005, 15:66–16:3. Wada does not describe an arbitrary burst

IPR2020-00985
Patent 6,651,134 B1

length but instead describes that a burst involves successively transferring data from four multiplexers. *Id.* ("Given the internal chunk address signal INT.CHA sent from the burst counter unit 8, the multiplexer 7 successively transfers to the data input/output pin 9 the data fed from the multiplexers 60a through 63a."). Thus, at least in Wada's Second Embodiment, the circuit is designed to generate a predetermined number of internal addresses, corresponding to the multiplexers 60a through 63a that provide data to multiplexer 7 for input/output.

While we agree with Patent Owner that generating the expected number of addresses in Wada depends on completing an uninterrupted burst, that is exactly the case in the asserted combination. As discussed above, when Wada is modified in light of Barrett, the result is a system in which a burst cannot be stopped once started. In that system, the burst counter generates the expected number of addresses—one for each multiplexer 60a through 63a.

### d.    Objective indicia of nonobviousness

Patent Owner argues that objective indicia of nonobviousness show that the subject matter of the claimed invention would not have been obvious. PO Resp. 53–66. Specifically, Patent Owner asserts that "there was a long-felt but unmet need for an SDRAM[8] that could transfer data quickly and efficiently using predetermined, non-interruptible bursts." *Id.* at 54.

According to Patent Owner, before the '134 patent, "burst accesses of JEDEC-compliant SDRAM memories were interruptible." *Id.* As support,

---

[8] Synchronous dynamic random access memory (SDRAM). *See* PO Resp. 1, 4.

Patent Owner points to a standard—JESD79F (Ex. 2010)—that it asserts was "first published in 2000" and includes a "BURST TERMINATE" command to truncate read bursts. *Id.* at 54–55 (citing Ex. 2010, 23, 27)[9]. The exhibit, however, bears a date of February 2008, and indicates it is a revision of a document published May 2005. Ex. 2010, 1. Nowhere does Patent Owner explain the discrepancy, or attempt to show that any revisions following the purported initial publication in 2000 were unrelated to the asserted burst terminate disclosures. That is, Patent Owner fails to demonstrate that the burst terminate command was part of the standard that was published in 2000 as opposed to the revised standard that was published in 2008. For that simple reason, we conclude Patent Owner has failed to meet its burden of showing that memory burst access prior to the '134 patent was interruptible.

Further, even if we were to accept that the burst terminate disclosures in the 2008 publication were also disclosed in the 2000 publication, the document does not support Patent Owner's substantive assertion. It notes that the "BURST TERMINATE" command "[a]pplies only to read bursts with autoprecharge disabled" and that "this command is undefined (and should not be used) for read bursts with autoprecharge enabled." Ex. 2010, 16 n.8.[10] Thus, even if the revised JESD79F standard had predated the '134 patent, it shows that non-interruptible bursts (which, in Patent Owner's

---

[9] Citations to the Joint Electron Device Engineering Council (JEDEC) standards (Exs. 2010–2018) refer to the page numbers added to the bottom of each page for this proceeding.

[10] The JESD79F standard provides auto precharge is an "option for each burst access" "to provide a self-timed row precharge that is initiated at the end of the burst access." Ex. 2010, 5.

IPR2020-00985
Patent 6,651,134 B1

view, are those with no option to terminate) were known and used before the '134 patent. The JESD79F standard discloses a logic circuit that can be configured to generate bursts with no option to terminate them—such as any write burst and any read burst with autoprecharge enabled. Thus, the standard contradicts Patent Owner's assertion that "[b]efore the invention of the '134 Patent, which issued on November 18, 2003, burst accesses of JEDEC-compliant SDRAM memories were interruptible." *See* PO Resp. 54. *Cf. ParkerVision, Inc. v. Qualcomm Inc.*, 903 F.3d 1354, 1361 (Fed. Cir. 2018) (holding that a reference discloses a device as claimed when it discloses a device that may operate as claimed at least in some configurations.

Moreover, Patent Owner's entire theory that the '134 patent met a long-felt need is unsupported and illogical. Patent Owner contends that prior to the '134 patent's invention, in DRAM[11] and SDRAM, "longer, more efficient bursts were not possible given the need to regularly refresh the DRAM cells." PO Resp. 64. In Patent Owner's view, that establishes "a long-felt need in the industry for a memory that could provide predetermined, non-interruptible burst operations." *Id.* at 65.

As explained above, the JESD79F standard already allowed predetermined non-interruptible bursts—i.e., bursts that could not be terminated with the burst terminate command. Moreover, the need to refresh DRAM cells could not have been solved by making bursts non-interruptible, because simply preventing interruption does not itself refresh the memory. Indeed, Patent Owner's declarant agreed that the '134 patent does not teach

---

[11] Dynamic Random Access Memory (DRAM). *See* PO Resp. 1, 4.

eliminating DRAM refreshes. *See id.* at 14 (citing Ex. 1015, 27:12–19). Rather, the patent discusses hiding refreshes by performing internal actions. Ex. 1001, 5:6–10, Fig. 6. As Petitioner explains, work prior to the '134 patent disclosed partitioning memory such that one portion may be refreshed while another is accessed—an approach termed "hiding" the refresh. *See* Pet. Reply 14–15 (citing Ex. 1008, code (57)); Pet. 60–65. Patent Owner has not sufficiently explained how the challenged claims addressed the need for memory refresh. We therefore find that Patent Owner has not demonstrated that the invention claimed in the '134 patent addressed a long-felt but unmet need.[12]

Finally, we note that Patent Owner's theory based on the JEDEC standards contradicts its claim-construction position. As evidence that later JEDEC standards (e.g., DDR3, DDR4) produced "non-interruptible" bursts, Patent Owner points to the standards removing the "BURST TERMINATE" command (Ex. 2011, 44, 92) or expressly stating that "[b]urst interrupts are not allowed" (Ex. 2012, 31). PO Resp. 55–56; *accord id.* at 57 (citing Ex. 2014, 34 n.5 ("Burst reads or writes cannot be terminated or interrupted.")). Indeed, Patent Owner draws a parallel between the burst terminate command in the early JEDEC standards (e.g., DDR) and "the falling of the advance signal" in Wada, which would "terminate the burst"

---

[12] Moreover, only claims 9 and 10 require the memory to be DRAM, and only claim 10 requires a burst sufficiently long to provide time for a DRAM refresh cycle (i.e., time for a hidden refresh). *See* Ex. 1001, 5:21–6:48. Thus, Patent Owner's evidence could at most show a nexus between claim 10 and the JEDEC standard. But as explained, Patent Owner has not established that non-interruptible bursts themselves addressed the need for DRAM refresh, or that non-interruptible bursts were required for other mechanisms to address DRAM refresh.

according to Patent Owner. Tr. 60:5–13. But the later JEDEC standards that eliminate the burst terminate command nonetheless require control signals that must be maintained high during read and write burst access, just as Wada requires the ADV signal must be maintained high during read and write burst access. *See, e.g.*, Ex. 2014, 27 (§ 2.1, "CKE must be maintained high throughout read and write access."). Thus, the later JEDEC standards that Patent Owner identifies as showing non-interruptible bursts describe circuits that depend on maintaining external signals in a particular way— which, according to Patent Owner, would make their bursts interruptible rather than non-interruptible.[13, 14] Accordingly, even if we were to accept Patent Owner's contention that there was a long-felt but unmet need for non-

---

[13] We note that accepting Patent Owner's assertions regarding the later JEDEC standards would require a finding that Wada anticipates the challenged claims. That is because the JEDEC standards, like Wada, describe interactions between external control devices and memory circuits to maintain certain control signals. *See, e.g.*, Ex. 2012, 12 (§ 2.4, describing functionality for external connections). If a circuit requires external devices to maintain control signals for non-interruptible address generation, then Wada discloses non-interruptible address generation.

[14] Even ignoring the dependence on external signals, we question Patent Owner's reliance on the DDR2 specification, which expressly allows for burst interruption for 8-bit bursts. Ex. 2011, 29–30 (§ 2.6 "However, in case of BL = 8 setting, two cases of interrupt by a new burst access are allowed, one reads interrupted by a read, the other writes interrupted by a write with 4 bit burst boundary respectively."). Patent Owner has not addressed how the claims, which require the bursts to be non-interruptible, are consistent with making bursts interruptible only in certain conditions. As for the standards that Patent Owner asserts "explicitly made bursts non-interruptible," the significantly later dates on those standards raise questions regarding their connection with the '134 patent. *See* Ex. 2012, 1 (May 2012); Ex. 2013, 1 (Aug. 2014); Ex. 2014, 1 (July 2012); Ex. 2015, 1 (June 2017); Ex. 2016, 1 (Feb. 2016).

interruptible bursts, we would find that Patent Owner has not shown the required nexus between the claimed invention and the later JEDEC standards because those standards do not generate non-interruptible bursts per Patent Owner's own interpretation of what that means. *See WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999) ("The patentee bears the burden of showing that a nexus exists between the claimed features of the invention and the objective evidence offered to show non-obviousness.").

### e.    Conclusion

As discussed, we find that a person of ordinary skill in the art had reason to modify Wada's system in light of Barrett, and that the combined teachings disclose all of claim 1's limitations. We have considered Patent Owner's assertions regarding objective indicia of nonobviousness together with Petitioner's proofs regarding the combined teachings of Wada and Barret and find the subject matter of claim 1 would have been obvious over Wada and Barrett.

For claims 2–4, 8, 12–14, 16, and 17, Petitioner provides contentions showing how the same combination of Wada and Barrett teach each of the elements recited in these claims. Pet. 17–53. Other than as addressed above regarding claim 1, Patent Owner does not challenge Petitioner's contentions regarding Wada's and Barrett's disclosures with respect to claims 2–4, 8, 12–14, 16, and 17. *See* PO Resp. 22–50. We determine Patent Owner has waived any such argument regarding these claims. *See* Paper 14, 8 ("Patent Owner is cautioned that any arguments not raised in the response may be deemed waived."); *In re NuVasive, Inc.*, 842 F.3d 1376, 1380–81 (Fed. Cir. 2016); Consolidated Trial Practice Guide 52 (Nov. 2019). We have reviewed

IPR2020-00985
Patent 6,651,134 B1

the parties' contentions and the evidence presented, including objective evidence of nonobviousness, and conclude that Petitioner has shown by a preponderance of the evidence that the subject matter of each of claims 2–4, 8, 12–14, 16, and 17 would have been obvious over Wada and Barrett.

D.   ADDITIONAL OBVIOUSNESS GROUNDS BASED ON WADA AND BARRETT

Petitioner asserts further that Fujioka, Reeves, and Lysinger, each disclose the limitations of challenged dependent claims and that skilled artisans had reasons to combine teachings from Fujioka, Reeves, or Lysinger with Wada and Barrett to arrive at those dependent claims. Pet. 53–72. Other than as discussed regarding claim 1, Patent Owner does not challenge Petitioner's contentions regarding combinations including Fujioka, Reeves, or Lysinger. *See* PO Resp. 50–53. We determine Patent Owner has waived any such argument. *See* Paper 14, 8; *In re NuVasive, Inc.*, 842 F.3d at 1380–81; Consolidated Trial Practice Guide 52.

We have reviewed the parties' contentions and evidence, including objective evidence of nonobviousness, and conclude that Petitioner has shown by a preponderance of the evidence: that the subject matter of each of claims 4–7 and 18–20 would have been obvious over Wada, Barrett, and Fujioka; that the subject matter of each of claims 9, 10, 14, and 21 would have been obvious over Wada, Barrett, and Reeves; and that the subject matter of each of claims 11 and 15 would have been obvious over Wada, Barrett, and Lysinger. *See* Pet. 53–72.

E.   GROUNDS BASED ON WADA WITHOUT BARRETT

Petitioner also challenges claims 1–21 as anticipated or rendered obvious over Wada alone or in combination with Fujioka, Reeves, or

IPR2020-00985
Patent 6,651,134 B1

Lysinger. *See* Pet. 17–71. We need not determine the merits of these challenges because, as explained above, Petitioner has demonstrated the unpatentability of claims 1–21 over the combination of Wada and Barrett, alone or in further combination with Fujioka, Reeves, or Lysinger. *See Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984) (finding an administrative agency is at liberty to reach a decision based on a single dispositive issue because doing so "can not only save the parties, the [agency], and [the reviewing] court unnecessary cost and effort," but can "greatly ease the burden on [an agency] faced with a . . . proceeding involving numerous complex issues and required by statute to reach its conclusion within rigid time limits").

### III.  CONCLUSION[15]

For the reasons discussed, we conclude:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–3, 8, 12, 13, 16, 17 | 102 | Wada | Not decided | Not decided |

---

[15] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2020-00985
Patent 6,651,134 B1

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–3, 8, 12, 13, 16, 17 | 103 | Wada | Not decided | Not decided |
| 1–3, 8, 12, 13, 16, 17 | 103 | Wada, Barrett | 1–3, 8, 12, 13, 16, 17 | |
| 4–7, 18–20 | 103 | Wada, Fujioka | Not decided | Not decided |
| 4–7, 18–20 | 103 | Wada, Barrett, Fujioka | 4–7, 18–20 | |
| 9, 10, 14, 21 | 103 | Wada, Reeves | Not decided | Not decided |
| 9, 10, 14, 21 | 103 | Wada, Barrett, Reeves | 9, 10, 14, 21 | |
| 11, 15 | 103 | Wada, Lysinger | Not decided | Not decided |
| 11, 15 | 103 | Wada, Barrett, Lysinger | 11, 15 | |
| **Overall Outcome** | | | 1–21 | |

## IV.  ORDER

It is

ORDERED that Petitioner has proven that claims 1–21 of the '134 patent are unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-00985
Patent 6,651,134 B1


PETITIONER:

Xin-Yi Zhou
Ryan K. Yagura
Nicholas J. Whilt
Brian M. Cook
O'MELVENY & MYERS LLP
vzhou@omm.com
ryagura@omm.com
nwhilt@omm.com
bcook@omm.com


PETITIONER:

Tyler R. Bowen
Roque Thuo
PERKINS COIE LLP
bowen-ptab@perkinscoie.com
thuo-ptab@perkinscoie.com


PATENT OWNER:

Theodoros Konstantakopoulos
Kevin McNish
DESMARAIS LLP
tkonstantakopoulos@desmarisllp.com
kkm-ptab@desmarisllp.com

Trials@uspto.gov
571-272-7822

Paper No. 33
Date: March 4, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

QUALCOMM INC.
and STMICROELECTRONICS, INC.,[1]

Petitioner,

v.

MONTEREY RESEARCH, LLC,
Patent Owner.

_____

IPR2020-01492
Patent 6,651,134 B1

_____

Before KRISTEN L. DROESCH, JOHN F. HORVATH, and
JASON W. MELVIN, *Administrative Patent Judges*.

MELVIN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

_____

[1] STMicroelectronics, Inc., which filed a petition in IPR2021-00702, has
been joined as a party to this proceeding. *See* Paper 23.

IPR2020-01492
Patent 6,651,134 B1

# I.    INTRODUCTION

## A.    BACKGROUND

Qualcomm Inc., ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting institution of *inter partes* review of claims 1–7 and 9–21 ("the challenged claims") of U.S. Patent No. 6,651,134 B1 (Ex. 1001, "the '134 patent"). Pet. 6. Monterey Research, LLC, ("Patent Owner") filed a Preliminary Response. Paper 6. After our email authorization, Petitioner filed a Preliminary Reply (Paper 7) and Patent Owner filed a Preliminary Sur-Reply (Paper 8). We instituted review. Paper 9 ("Institution Decision" or "Inst.").

After institution, STMicroelectronics, Inc. ("STM") was joined as a party. Paper 23. In *Advanced Micro Devices, Inc. and STMicroelectronics, Inc. v. Monterey Research, LLC*, IPR2020-00985, Paper 31 (Nov. 30, 2021), we determined that STM showed by a preponderance of the evidence that claims 1–21 of the '134 patent are unpatentable. Thus, STM is estopped from challenging the patentability of those claims in this proceeding. *See* 35 U.S.C. § 315(e)(1). Thus, our use of "Petitioner" in this decision, including the Order below, refers solely to Qualcomm.

Patent Owner filed a Response (Paper 16, "PO Resp."), Petitioner filed a Reply (Paper 21, "Pet. Reply"), and Patent Owner filed a Sur-Reply (Paper 24, "PO Sur-Reply"). An oral hearing was held on December 7, 2021, and a transcript appears in the record. Paper 30 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(b). This is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons set forth below, we find Petitioner has demonstrated by a preponderance of evidence that claims 1–7 and 9–21 of the '134 patent are unpatentable.

IPR2020-01492
Patent 6,651,134 B1

## B. RELATED MATTERS

As required by regulation, the parties identify matters related to the '134 patent. Pet. 2–3; Paper 3, 1–2. Of note is *Advanced Micro Devices, Inc. v. Monterey Research, LLC*, IPR2020-00985, in which AMD challenged all claims of the '134 patent. We issued a final written decision in that proceeding on November 30, 2021, determining all claims unpatentable. IPR2020-00985, Paper 31. Additionally, the district-court case involving Qualcomm is identified as *Monterey Research, LLC v. Qualcomm Inc. et al.*, No. 1:19-cv-02083 (D. Del. 2019), whereas the case involving AMD is identified as *Monterey Research, LLC v. Advanced Micro Devices Inc.*, No. 1:19-cv-02149 (D. Del. 2019). Paper 3, 1; Pet. 3.

## C. REAL PARTIES IN INTEREST

Petitioner identifies itself, Qualcomm Technologies, Inc., and Qualcomm CDMA Technologies Asia-Pacific Pte Ltd. as real parties in interest. Pet. 2. Patent Owner identifies itself and IPValue Management as real parties in interest. Paper 3, 1.

## D. THE '134 PATENT

The '134 patent is titled Memory Device with Fixed Length Non Interruptible Burst. Ex. 1001, code (54). The patent discloses that "the data burst transfers of conventional memories can be interrupted and single access made," and proposes a memory device "that has a fixed burst length." *Id.* at 1:37–45.

IPR2020-01492
Patent 6,651,134 B1

Figure 1 is reproduced below:



**FIG. 1**

Ex. 1001, Fig. 1. Figure 1 depicts circuit 100 configured as a fixed burst memory, in which circuit 102 accepts external signals including external address signal ADDR_EXT, and "generate[s] the signal ADDR_INT as a fixed number of addresses in response to the signal CLK." *Id.* at 3:21–22. The '134 patent states that "[o]nce the circuit 102 has started generating the fixed number of addresses, the circuit 102 will generally not stop until the fixed number of addresses has been generated (e.g., a non-interruptible burst)." *Id.* at 3:25–28.

The '134 patent depicts two embodiments for circuit 102, in Figures 2 and 3. Figure 2 is reproduced below:

IPR2020-01492
Patent 6,651,134 B1



## FIG. 2

*Id.* Fig. 2. Figure 2 shows burst counter 128 receiving signal CLK (a clock signal), signal ADV, and signal BURST, and providing signal BURST_CLK. "When the signal ADV is asserted, the burst counter 128 will generally present the signal BURST_CLK in response to the signal CLK. The signal BURST_CLK generally contains a number of pulses that has been programmed by the signal BURST." *Id.* at 4:10–14. Figure 3 and the associated description disclose an alternative circuit, in which "counter 138 may be configured to generate a number of addresses in response to the signals CLK, BURST[,] and ADV" and where "[t]he number of addresses generated by the counter 138 may be programmed by the signal BURST." *Id.* at 4:29–34. The '134 patent describes more generally that, "[w]hen the signal ADV is asserted, the circuit 100 will generally generate a number of address signals" and that "[t]he address signals will generally continue to be generated until the Nth address signal is generated." *Id.* at 4:42–48.

IPR2020-01492
Patent 6,651,134 B1

## E. CHALLENGED CLAIMS

Challenged claim 1 is reproduced below:

1. A circuit comprising:

> a memory comprising a plurality of storage elements each configured to read and write data in response to an internal address signal; and

> a logic circuit configured to generate a predetermined number of said internal address signals in response to (i) an external address signal, (ii) a clock signal and (iii) one or more control signals, wherein said generation of said predetermined number of internal address signals is non-interruptible.

Ex. 1001, 5:22–32. Independent claim 16 recites limitations similar to those of claim 1, expressed as means-plus-function elements. *Id.* at 6:20–30. Independent claim 17 recites limitations similar to those of claim 1, expressed as a "method of providing a fixed burst length data transfer." *Id.* at 6:31–39. Claims 2–7 and 9–15 depend, directly or indirectly, from claim 1. *Id.* at 5:33–6:19. Claims 18–21 depend, directly or indirectly, from claim 17. *Id.* at 6:40–48.

## F. PRIOR ART AND ASSERTED GROUNDS

Petitioner asserts the following grounds of unpatentability:

| Claim(s) Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1–5, 7, 9, 10, 12–18, 20, 21 | 102 | Schaefer[2] |
| 1–7, 9, 10, 12–21 | 103 | Schaefer, Fujioka[3] |
| 11 | 103 | Schaefer, Lysinger[4] |

---

[2] U.S. Patent No. 5,600,605 (Ex. 1017).
[3] U.S. Patent No. 6,185,149 (Ex. 1006).
[4] U.S. Patent No. 5,784,331 (Ex. 1009).

IPR2020-01492
Patent 6,651,134 B1

| Claim(s) Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 11 | 103 | Schaefer, Lysinger, Fujioka |

Pet. 6–7. Petitioner also relies on the Declaration of Robert Murphy.
Ex. 1015.

## II.    ANALYSIS

### A.    LEVEL OF ORDINARY SKILL IN THE ART

Petitioner proposes that a person of ordinary skill "would have had at least a degree in electrical or computer engineering, and at least two years of experience in design, development, and/or testing of memory circuits, related hardware design, or the equivalent, with additional education substituting for experience and vice versa." Pet. 14 (citing Ex. 1015 ¶ 48). Patent Owner does not dispute this definition of a person of ordinary skill. PO Resp. 21.[5] We adopt Petitioner's proposed level of ordinary skill as it appears to be consistent with the level of skill reflected by the specification and in the asserted prior art references.

### B.    CLAIM CONSTRUCTION

For an *inter partes* review petition filed after November 13, 2018, we construe claim terms "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2019). Petitioner proposes constructions for the following terms: "non-interruptible," "internal address signal,"

---

[5] As discussed below, Patent Owner does challenge the credibility of Petitioner's expert witness based on his testimony in a district-court litigation supporting a slightly different level of ordinary skill in the art for the '134 patent. *See* PO Resp. 21; *infra* at 12 n.6.

IPR2020-01492
Patent 6,651,134 B1

"predetermined number of [said] internal address signals," "fixed burst length," "means for reading data" and "means for generating a predetermined number of said internal address signals." Pet. 21–27.

In the Institution Decision, we adopted the parties' construction for "non-interruptible"—"cannot be stopped or terminated once initiated until the fixed number of internal addresses has been generated." Inst. 7. The parties do not dispute that construction (*see* PO Resp. 22), and we maintain it for this decision.

We also adopted the parties agreed constructions for the two "means for" terms in claim 16. Inst. 8–9. Patent Owner expressly confirms it agrees with those constructions. PO Resp. 22–23. We maintain those constructions here. Thus, we apply the "means for reading data from and writing data to a plurality of storage elements in response to a plurality of internal address signals" to require a corresponding structure of a memory array 104, or equivalents. We apply the "means for generating a predetermined number of said internal address signals . . ." to require a corresponding structure of burst address counter/register 102, as depicted in either Figure 2 or Figure 3 of the '134 patent, or equivalents.

As to the remaining terms for which Petitioner proposes a construction, none affects a dispute in this proceeding and therefore none warrants construction. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

## C.   ANTICIPATION BY SCHAEFER

Schaefer discloses a "synchronous dynamic random access memory (SDRAM)" in which command signals and address bits cause a controller to access memory cells in a variety of ways. Ex. 1017, code (57). Schaefer

IPR2020-01492
Patent 6,651,134 B1

explains that "a SDRAM requires separate commands for accessing and precharging a row of storage cells in the SDRAM memory array." *Id.* at 1:33–35. That precharge operation "deactivate[s] and precharge[s] a previously accessed bank memory ar[ra]y" and may result in wasted time between read and write operations. *Id.* at 1:42–54. Schaefer discloses the ability to use an "AUTO-PRECHARGE command feature" so that "a manual PRECHARGE command does not need to be issued during the functional operation" of the SDRAM. *Id.* at 7:29–40. "The AUTO-PRECHARGE command insures that the precharge is initiated at the earliest, valid stage within a burst cycle." *Id.* at 7:40–42. When the AUTO-PRECHARGE command is used in conjunction with a READ or WRITE command, "[t]he user is not allowed to issue another command until the precharged time ($t_{RP}$) is completed." *Id.* at 7:42–44. To that end, "[a] no operation (NOP) command can be provided to SDRAM 20 to prevent other unwanted commands from being registered during idle or wait states." *Id.* at 8:8–10. Schaefer depicts the timing of a read operation using the auto-precharge option in Figure 4, reproduced below:

IPR2020-01492
Patent 6,651,134 B1



**FIG. 4**    ▨ DON'T CARE    ▧ UNDEFINED

Figure 4 depicts a four-cycle burst transfer read operation, in which the READ command is given at time $t_2$, the first cycle of data is output at time $t_4$, and the precharge period $t_{RP}$ runs from time $t_6$ to time $t_9$. *Id.* at 8:37–9:1, Fig. 4.

Petitioner contends that Schaefer's SDRAM memory discloses the circuit elements (e.g., memory, logic circuit) required by the challenged claims. Pet. 36–38 (quoting Ex. 1017, Fig. 1). In Petitioner's view, by disclosing burst read and write operations that use the AUTO-PRECHARGE feature, Schaefer also discloses generating a predetermined number of internal address signals such that the generation is non-interruptible. Pet. 40–43.

Patent Owner does not dispute that Schaefer discloses the circuit elements required by the challenged claims. Instead, Patent Owner contends that Schaefer does not disclose non-interruptible address generation because

IPR2020-01492
Patent 6,651,134 B1

it discusses burst interruption in certain contexts and prohibits user commands only during the precharge period. PO Resp. 29–30.

As to Schaefer's discussion of burst interruptions, Patent Owner points out that Schaefer discloses a "full-page burst," which "will wrap around and continually restart the 'burst' operation until a BURST TERMINATION command or PRECHARGE command is indicated by command controller 28 or until interrupted with another burst operation." Ex. 1017, 5:15–19; *see* PO Resp. 30–31. Patent Owner submits that those burst-termination options are required for a full-page burst, i.e., that a full-page burst *must* be terminated by user command. PO Resp. 31–32.

As to prohibiting commands only during the precharge period, Patent Owner argues that Schaefer's concern for wasted clock cycles between bursts motivated its focus on "reducing the amount of time required to perform the PRECHARGE and ACTIVE command operations necessary for proper SDRAM operation." *Id.* at 33. According to Patent Owner, when a user desires to read a data series shorter than an available burst length, terminating the burst once the desired data have been read would save clock cycles. *Id.* at 34–36. Thus, Patent Owner reasons that Schaefer's prohibition on user commands when an AUTO-PRECHARGE option has been issued would apply only once the precharge time has started, not before then. *Id.* at 36.

Thus, the parties dispute whether Schaefer's prohibition on user commands begins with the issuance of a read or write command using the AUTO-PRECHARGE option (time $t_2$ in Figure 4) as Petitioner contends, or instead begins only when the resulting precharge operation begins (time $t_6$ in

IPR2020-01492
Patent 6,651,134 B1

Figure 4) as Patent Owner contends. *Id.* at 36–37; Pet. Reply 7; PO
Sur-Reply 4.

Patent Owner asserts that because Schaefer "is directed to eliminating
wasted cycles *in between* bursts by reducing the amount of time necessary to
complete PRECHARGE and ACTIVE command operations," Schaefer's
disclosures relate to completing the precharge operation before immediately
activating a row. PO Resp. 38–39. Patent Owner reasons that because
interrupting precharge or row-activation operations would interfere with
memory operation, preventing interruption during those operations makes
sense. PO Resp. 40–45. That aspect of Schaefer's operation, however, is not
in dispute—the question is whether Schaefer's prohibition on interruption
begins before the precharge operation begins.

Patent Owner's arguments fail to overcome Schaefer's express
statement that, when a READ or WRITE command is issued with the
AUTO-PRECHARGE feature, "[t]he user is not allowed to issue *another*
command until the precharged time ($t_{RP}$) is completed." Ex. 1017, 7:32–44
(emphasis added).  In this context, *another* command refers to any user
command other than or in addition to the user command that initiated a burst
address generation (e.g., READ at time $t_2$ in Figure 4). Thus, Schaefer's
statement prohibiting *another* command until the end of the precharge
period also precludes issuing a burst terminate command before the
precharge period begins (time $t_6$ in Figure 4).

Petitioner's expert supports this interpretation of Schaefer, explaining
that a device could be designed to allow interruptions before the precharge
period, but that doing so "would have been more costly (more circuitry) and
may have detrimentally impacted the speed of operation." Ex. 1015 ¶ 83. In

IPR2020-01492
Patent 6,651,134 B1

light of that tradeoff—a classic engineering decision balancing features against cost—it is logical and reasonable to interpret Schaefer's statement according to its plain words. We agree with Petitioner that although Schaefer's system could have been designed to behave as Patent Owner asserts it does, that is not what Schaefer describes. Pet. Reply 9. Although Patent Owner criticizes Petitioner's expert, Mr. Murphy, for not definitively stating that allowing interruptions would have impaired the circuit's speed of operation (PO Sur-Reply 9), we do not view his testimony as flawed for that reason. The actual effect on a circuit depends on many aspects beyond the scope of Schaefer's disclosures and we see no reason to require that Petitioner show actual impacts of potential redesigns, beyond a credible expert testifying as to the principles underlying Schafer's choice.[6]

Patent Owner argues that because Schaefer states that "[t]he AUTO-PRECHARGE command insures that the precharge is initiated at the earliest, valid stage within a burst cycle," its prohibition on user commands "until the precharged time ($t_{RP}$) is completed" begins only when precharge is initiated. PO Sur-Reply 5–6 (quoting Ex. 1017, 7:38–44 (emphasis omitted)). According to Patent Owner, the reference to $t_{RP}$ not only defines the end of the prohibition period, but also defines the start of the prohibition. *Id.* We do not agree. The quoted passage repeats the benefit of using an

---

[6] Patent Owner argues that the opinions of Petitioner's expert, Mr. Murphy, should be accorded little weight because he gave a different opinion on the level of ordinary skill in the art when testifying in another proceeding. PO Resp. 23–28. We do not agree that the differences in Mr. Murphy's testimony suggest bias, unreliability, or any other characteristic that would undermine his credibility. As Petitioner explains, Mr. Murphy adopted the level of skill proposed by AMD in IPR2020-00985, which also involved the '134 patent. Pet. Reply 5–6.

IPR2020-01492
Patent 6,651,134 B1

AUTO-PRECHARGE option with a burst command—the precharge operation begins at the earliest possible stage.  But identifying when the precharge operation begins does not identify when the prohibition against issuing *another* command begins. Rather, the statement that a "user is not allowed to issue another command" connects the prohibition to the last issued user command, which is the READ or WRITE command with AUTO-PRECHARGE. Ex. 1017, 7:38–44. Thus, we do not agree with Patent Owner's strained interpretation of Schaefer's plain language. *See* PO Sur-Reply 7–8.

Further, we agree with Petitioner that additional evidence supports that Schaefer does not permit termination of fixed-length burst operations with the AUTO-PRECHARGE option selected. *See* Pet Reply 12–15. Schaefer discusses burst termination, but only for "full page" (as opposed to fixed-length) bursts, which do not use the AUTO-PRECHARGE option. *See id.* at 12–13 (citing Ex. 1017, 5:15–19, 5:59–62; Ex. 1029, 34:8–23, 36:5–37:12, 38:17–39:8). Because full-page bursts require termination, Schaefer discusses the need for user-issued burst-terminate commands. Ex.1017, 5:15–19; Ex. 1029, 36:5–18. Likewise, because fixed-length bursts complete automatically and do not require user termination, Schaefer does not discuss user-issued burst-terminate commands in the context of fixed-length burst commands.  Moreover, there is no inherent requirement that Schaefer permit such commands in that context. Pet. Reply 13. In short, we agree with Petitioner that the evidence is consistent with Schaefer's prohibition of user commands from the time a fixed-length burst is initiated with the AUTO-PRECHARGE selected. According to Schaefer's plain words, in fixed-length bursts with AUTO-PRECHARGE, any user command ("another")

IPR2020-01492
Patent 6,651,134 B1

after the initial burst command is prohibited until precharge is complete. Ex. 1017, 7:42–44. Therefore, Schaefer's address generation is non-interruptible as claimed.

Patent Owner does not otherwise dispute Petitioner's anticipation contentions for claims 1–5, 7, 9, 10, 12–18, 20, or 21. *See* PO Resp. 29–52; Pet. Reply 15; PO Sur-Reply 4.

We have considered Petitioner's contentions in light of the full record and conclude that Petitioner has shown by a preponderance of the evidence that Schaefer anticipates claims 1–5, 7, 9, 10, 12–18, 20, and 21.

### D.   OBVIOUSNESS OVER SCHAEFER AND FUJIOKA

Petitioner contends that claims 1–7, 9, 10, and 12–21 are obvious over the combination of Schaefer and Fujioka. Pet. 64–77. Fujioka discloses a memory circuit that generates bursts, and includes embodiments with mode-selection circuitry that enables burst length to be set during the fabrication process. Ex. 1006, 4:24–25, 14:55–15:24. Petitioner argues that skilled artisans would have had reason to use Fujioka's mode-selection circuitry to set Schaefer's burst length because it "would have reduced the amount of circuitry required in Schaefer's mode register 40, the initialization time before burst operations, and the testing time, all while still providing a degree of programmability." Pet. 66 (citing Ex. 1015 ¶ 133); *id.* at 66–67 (providing additional reasons for the combination). Other than as relates to Schaefer's disclosures discussed above, Patent Owner does not contest Petitioner's contentions. *See* PO Resp. 52–53.

We have considered Petitioner's contentions in light of the full record and conclude that Petitioner has shown by a preponderance of the evidence

IPR2020-01492
Patent 6,651,134 B1

that the combination of Schaefer and Fujioka renders obvious the subject matter of claims 1–7, 9, 10, and 12–21. *See* Pet. 64–77.

### E.   OBVIOUSNESS OVER SCHAEFER AND LYSINGER

Claim 11 depends from claim 1 and recites that the "predetermined number of internal address signals is chosen to meet predetermined criteria for sharing address and control busses." Ex. 1001, 6:4–7. Petitioner submits that claim 11 would have been obvious over the combined disclosures of Schaefer and Lysinger. Pet. 77–82.

Lysinger discloses a memory circuit with a burst controller that increments memory addresses. Ex. 1009, 2:5–7. As one approach, Lysinger teaches delaying the transmission of a new address until the end of a possible "timing window" such that the memory device may "perform other functions such as accessing other memory devices or interfacing with the microprocessor." *Id.* at 26:34–49.

Petitioner asserts that skilled artisans "would have understood the advantage of increased data throughput by being able to access additional memory arrays by using the address and control busses that were freed." Pet. 80 (citing Ex. 1015 ¶ 168).

Other than as relates to Schaefer's disclosures discussed above, Patent Owner does not contest Petitioner's contentions. *See* PO Resp. 53. We have considered Petitioner's contentions in light of the full record and conclude that Petitioner has shown by a preponderance of the evidence that the combination of Schaefer and Lysinger renders obvious the subject matter of claim 11. *See* Pet. 77–82.

IPR2020-01492
Patent 6,651,134 B1

## III.  CONCLUSION[7]

For the reasons discussed, we conclude:

| Claim(s) | 35 U.S.C. §[8] | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not Shown Unpatentable |
|---|---|---|---|---|
| 1–5, 7, 9, 10, 12–18, 20, 21 | 102 | Schafer | 1–5, 7, 9, 10, 12–18, 20, 21 | |
| 1–7, 9, 10, 12–21 | 103 | Schaefer, Fujioka | 1–7, 9, 10, 12–21 | |
| 11 | 103 | Schaefer, Lysinger | 11 | |
| 11 | 103 | Schaefer, Lysinger, Fujioka | | |
| **Overall Outcome** | | | 1–7, 9–21 | |

---

[7] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[8] We do not reach the ground based on Schaefer, Lysinger, and Fujioka (*see supra* at 6) because doing so would not change the overall outcome of this Decision. *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. Apr. 30, 2020) (nonprecedential) (recognizing that the "Board need not address issues that are not necessary to the resolution of the proceeding" and, thus, agreeing that the Board has "discretion to decline to decide additional instituted grounds once the petitioner has prevailed on all its challenged claims").

IPR2020-01492
Patent 6,651,134 B1

## IV.  ORDER

It is

ORDERED that Petitioner has proven that claims 1–7 and 9–21 of the
'134 patent are unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision,
parties to the proceeding seeking judicial review of the decision must
comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-01492
Patent 6,651,134 B1


For PETITIONER in IPR2020-01492:

Eagle H. Robinson
Daniel S. Leventhal
Richard S. Zembek
NORTON ROSE FULBRIGHT US LLP
eagle.robinson@nortonrosefulbright.com
daniel.leventhal@nortonrosefulbright.com
richard.zembek@nortonrosefulbright.com

For PETITIONER in IPR2021-00702:

Tyler Bowen
Roque Thuo
PERKINS COIE LLP
Bowen-ptab@perkinscoie.com
Thuo-ptab@perkinscoie.com

For PATENT OWNER:

Theodoros Konstantakopoulos
Yung-Hoon Ha
Christian M. Dorman
DESMARAIS LLP
tkonstantakopoulos@desmaraisllp.com
yha@desmaraisllp.com
cdorman@desmaraisllp.com



US006651134B1

(12) **United States Patent**    (10) **Patent No.:**    **US 6,651,134 B1**
Phelan    (45) **Date of Patent:**    **Nov. 18, 2003**

(54) **MEMORY DEVICE WITH FIXED LENGTH NON INTERRUPTIBLE BURST**

(75) Inventor: **Cathal G. Phelan**, Mountain View, CA (US)

(73) Assignee: **Cypress Semiconductor Corp.**, San Jose, CA (US)

( * ) Notice:    Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/504,344**

(22) Filed: **Feb. 14, 2000**

(51) Int. Cl.[7] ................................................ **C06F 12/00**
(52) U.S. Cl. ...................... **711/104**; 711/105; 711/167; 711/169; 710/35; 365/233; 365/238.5
(58) Field of Search ........................ 711/104–105, 169, 711/167; 365/233, 238.5; 710/35

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,651,138 A  *  7/1997  Le et al. ...................... 711/154
5,729,504 A  *  3/1998  Cowles ........................ 365/236
5,805,928 A  *  9/1998  Lee ............................. 710/35
5,936,975 A  *  8/1999  Okamura .................... 714/719
5,966,724 A  * 10/1999  Ryan ........................... 711/105
6,085,261 A  *  7/2000  McIntyre, Jr. et al. ........ 710/35
6,289,138 B1  *  9/2001  Yip et al. .................... 382/307

OTHER PUBLICATIONS

Understanding Burst Modes in Synchronous SRAMs, Cypress Semiconductor Corp., Jun. 30, 1999.

* cited by examiner

*Primary Examiner*—Donald Sparks
*Assistant Examiner*—Medhi Namazi
(74) *Attorney, Agent, or Firm*—Christopher P. Maiorana, P.C.; Robert M. Miller

(57)    **ABSTRACT**

An integrated circuit comprising a memory and a logic circuit. The memory may comprise a plurality of storage elements each configured to read and write data in response to an internal address signal. The logic circuit may be configured to generate a predetermined number of the internal address signals in response to (i) an external address signal, (ii) a clock signal and (iii) one or more control signals. The generation of the predetermined number of internal address signals may be non-interruptible.

**21 Claims, 3 Drawing Sheets**





Petitioner AMD Ex-1001, 0001



**FIG. 1**



**FIG. 2**

Petitioner AMD Ex-1001, 0002



**FIG. 3**



**FIG. 4**

Petitioner AMD Ex-1001, 0003



**FIG. 5A**



**FIG. 5B**

**FIG. 6**

Petitioner AMD Ex-1001, 0004

US 6,651,134 B1

<table>
<tr><td>

**1**

MEMORY DEVICE WITH FIXED LENGTH
NON INTERRUPTIBLE BURST

FIELD OF THE INVENTION

The present invention relates to memory devices generally and, more particularly, to a memory device that transfers a fixed number of words of data with each access.

BACKGROUND OF THE INVENTION

A synchronous Static Random Access Memory (SRAM) can provide data from multiple address locations using a single address. Accessing multiple locations in response to a single address is called a burst mode access. A memory device that provides a burst mode can reduce activity on the address and control buses. The burst mode of a conventional synchronous SRAM can be started and stopped in response to a control signal.

A conventional Dynamic Random Access Memory (DRAM) preserves data during periodic absences of power by implementing a memory cell as a capacitor and an access transistor. Since the charge on the capacitor will slowly leak away, the cells need to be "refreshed" once every few milliseconds. Depending on the frequency of accesses, a conventional DRAM can need an interrupt to perform data refreshes. Using a DRAM in a burst application is difficult because of the need to refresh. Completely hiding refresh cycles (e.g., refreshing data without the need for interrupts) in a DRAM cannot happen with conventional memory devices due to architecture choices that have been made. Data word bursts can be interrupted while in progress since conventional architectures support both burst and single access modes. Conventional DRAM access takes about 10 ns to get data, but nearly 20 ns to complete writeback and equalization. The addition of another 20 ns for a refresh results in a total access of 40 ns.

Since the data burst transfers of conventional memories can be interrupted and single accesses made, the amount of time that the data, address and control busses are not in use can vary. The variability of bus availability complicates the design of systems with shared data, address and control busses.

It would be desirable to have a memory device that has a fixed burst length.

SUMMARY OF THE INVENTION

The present invention concerns an integrated circuit comprising a memory and a logic circuit. The memory may comprise a plurality of storage elements each configured to read and write data in response to an internal address signal. The logic circuit may be configured to generate a predetermined number of the internal address signals in response to (i) an external address signal, (ii) a clock signal and (iii) one or more control signals. The generation of the predetermined number of internal address signals may be non-interruptible.

The objects, features and advantages of the present invention include providing a fixed burst memory that may (i) give network customers who typically burst large data lengths the ability to set a fixed burst length that suits their particular needs; (ii) have non-interruptible bursts; (iii) free up the address bus and control bus for a number of cycles; (iv) provide programmability for setting the burst length by using DC levels [Vss or Vcc] on external pins; (v) hide required DRAM refreshes inside a known fixed burst length of data words; and/or (vi) operate at higher frequencies without needing interrupts to perform refreshes of data.

</td><td>

**2**

BRIEF DESCRIPTION OF THE DRAWINGS

These and other objects, features and advantages of the present invention will be apparent from the following detailed description and the appended claims and drawings in which:

FIG. 1 is a block diagram illustrating a preferred embodiment of the present invention;

FIG. 2 is a detailed block diagram illustrating a circuit 102 of FIG. 1;

FIG. 3 is a detailed block diagram of a circuit 102' illustrating an alternative embodiment of the circuit 102 of FIG. 1;

FIG. 4 is a flow diagram illustrating an example burst address sequence;

FIGS. 5A and 5B are diagrams illustrating example operations of a 4 word (FIG. 5A) and an 8 word (FIG. 5B) fixed burst access in accordance with the present invention; and

FIG. 6 is a diagram illustrating an example operation where a burst length may be long enough to include a writeback and a refresh cycle.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENTS

Referring to FIG. 1, a block diagram of a circuit 100 is shown in accordance with a preferred embodiment of the present invention. The circuit 100 may be implemented, in one example, as a fixed burst memory. The circuit 100 may be configured to transfer a fixed number of words of data with each access (e.g., read or write). A number of words transferred as a group is called a burst. The circuit 100 generally comprises a circuit 102 and a memory array (or circuit) 104. The circuit 102 may be implemented, in one example, as a burst address counter/register. The memory array 104 may be implemented, in one example, as a static random access memory (SRAM), a dynamic random access memory (DRAM), or other appropriate memory to meet the design criteria of a particular implementation.

The circuit 102 may have an input 106 that may receive a signal (e.g., ADDR_EXT), an input 108 that may receive a signal (e.g., LOAD), an input 110 that may receive a signal (e.g., CLK), an input 112 that may receive a signal (e.g., ADV), and an input 114 that may receive a signal (e.g., BURST). The circuit 102 may have an output 116 that may present a signal (e.g., ADDR_INT) to an input 118 of the memory 104. The memory 104 may have an input 120 that may receive a signal (e.g., R/Wb), an input 122 that may receive a signal (e.g., DATA_IN) and an output 122 that may present a signal (e.g., DATA_OUT). The various signals are generally "on" (e.g., a digital HIGH, or 1) or "off" (e.g., a digital LOW, or 0). However, the particular polarities of the on (e.g., asserted) and off (e.g., de-asserted) states of the signals may be adjusted (e.g., reversed) accordingly to meet the design criteria of a particular implementation.

The signal ADDR_EXT may be, in one example, an external address signal. The signal ADDR_EXT may be n-bits wide, where n is an integer. The signal CLK may be a clock signal. The signal R/Wb may be a control signal that may be in a first state or a second state. When the signal R/Wb is in the first state, the circuit 100 will generally read data from the memory circuit 104 for presentation as the signal DATA_OUT. When the signal R/Wb is in the second state, the circuit 100 will generally store data received as the signal DATA_IN.

The signal LOAD may be, in one example, an address load control signal. The circuit 100 may be configured to

</td></tr>
</table>

Petitioner AMD Ex-1001, 0005

US 6,651,134 B1

3

load an initial address, presented by the signal ADDR_EXT, in response to the signal LOAD. The initial address may determine the initial location where data transfers to and from the memory 104 will generally begin.

The signal ADV may be, in one example, used as a control signal. The circuit 100 may be configured to transfer a fixed number of words to or from the memory 104 in response to the signals ADV, CLK and R/Wb. When the signal ADV is asserted, the circuit 100 will generally begin transferring a predetermined number of words. The transfer is generally non-interruptible. In one example, the signal ADV may initiate the generation of a number of addresses for presentation as the signal ADDR_INT.

The signals ADV and LOAD may be, in one example, a single signal (e.g., ADV/LDb). The signal ADV/LDb may be a control signal that may be in a first state or a second state. When the signal ADV/LDb is in the first state, the circuit 102 will generally load an address presented by the signal ADDR_EXT as an initial address. When the signal ADV/LDb is in the second state, the circuit 102 may be configured to generate the signal ADDR_INT as a fixed number of addresses in response to the signal CLK. The signal ADDR_INT may be, in one example, an internal address signal. The signal ADDR_INT may be n-bits wide. Once the circuit 102 has started generating the fixed number of addresses, the circuit 102 will generally not stop until the fixed number of addresses has been generated (e.g., a non-interruptible burst).

The signal BURST may be, in one example, a configuration signal for programming the fixed number of addresses that the circuit 102 may generate in response to the signals CLK and ADV/LDb. The signal BURST may be generated, in one example, by (i) using bond options, (ii) voltage levels applied to external pins, or (iii) other appropriate signal generation means.

When the memory 104 is implemented as a DRAM, the circuit 100 may be configured to hide required DRAM refreshes (e.g., refreshes may occur without affecting external environment) inside a known fixed burst length of data words. The fixed burst length may allow the circuit 100 to operate at higher frequencies than a conventional DRAM without needing interrupts to perform refreshes of data. In one example, the fixed burst length may be four or eight words. However, the burst length may be set to whatever length is necessary to meet the design criteria of a particular application. For example, the burst length may be programmed, in one example, to allow both writeback and refresh to occur within a single access. The fixed burst-.length may be set, in one example, longer or shorter depending upon a frequency or technology to be used.

The circuit 100 may be configured to provide a fixed burst length that may suit the requirements of network customers who typically burst large data lengths. By providing a fixed burst length, the circuit 100 may allow shared usage of data, address and control busses. A fixed length non-interruptible burst generally frees up the address bus and control bus for a known number of cycles. The address and control busses may be shared by a number of memory devices. The circuit 100 may provide a more reliable and/or accurate burst than is possible with multiple chips.

Referring to FIG. 2, a detailed block diagram illustrating implementation of the circuit 102 is shown. The circuit 102 may comprise an address counter register 126 and a burst counter 128. The address counter register 126 generally receives the signals ADDR_EXT, LOAD, and CLK. The address counter register 126 may be configured to present

4

the signal ADDR_INT. The signal ADV and the signal BURST may be presented to a burst counter 128. The signal CLK may be presented at an input 130 of the burst counter 128. The burst counter 128 may have an output 132 that may present a signal (e.g., BURST_CLK) at an input 134 of the circuit 126. An initial address may be loaded into the address counter register 126 by presenting the initial address in the signal ADDR_EXT and asserting the signal LOAD. The circuit 126 may be configured to increment an address in response to the signal BURST_CLK. When the signal ADV is asserted, the burst counter 128 will generally present the signal BURST_CLK in response to the signal CLK. The signal BURST_CLK generally contains a number of pulses that has been programmed by the signal BURST.

Referring to FIG. 3, a detailed block diagram illustrating an alternative embodiment of the circuit 102 is shown. The circuit 102' may comprise a latch 134, a multiplexer 136 and a counter 138. The signals ADDR_EXT, LOAD and CLK may be presented to the latch 134. The latch 134 may have an output 140 that may present a portion (e.g., m bits, where m is an integer smaller than n) of the signal ADDR_EXT as a portion of the signal ADDR_INT, an output 142 that may present a second portion (e.g., k bits, where k is an integer smaller than n) of the signal ADDR_EXT to a first input of the multiplexer 136, and an output 144 that may present the second portion of the signal ADDR_EXT to an input 146 of the counter 138.

The signals ADV, CLK and BURST may be presented to inputs of the counter 138. The counter 138 may be configured to generate a number of addresses in response to the signals CLK, BURST and ADV. The number of addresses generated by the counter 138 may be programmed by the signal BURST.

The signal BURST may be presented to a control input of the multiplexer 136. The multiplexer 136 may select between a number of signals from the latch 134 and a number of signals from the counter 138 to be presented as a second portion of the signal ADDR_INT in response to the signal BURST.

Referring to FIG. 4, a flow diagram illustrating an example burst address sequence is shown. When the signal ADV is asserted, the circuit 100 will generally generate a number of address signals, for example, N where N is an integer. The address signals may be generated, in one example, on a rising edge of the signal CLK. The address signals will generally continue to be generated until the Nth address signal is generated.

Referring to FIGS. 5A and 5B, timing diagrams illustrating example operations for a four word (FIG. 5A) and an eight word (FIG. 5B) fixed burst memory in accordance with the present invention are shown. The timing diagrams generally illustrate externally measurable signals for four and eight word fixed burst read/write architectures. In general, an operation (e.g., read or write) of the circuit 100 begins with loading an initial address (e.g., portions 150, 154, and 158 of FIG. 5A; portions 150', 154', and 158' of FIG. 5B). Starting with the initial address, a fixed number of words are generally transferred (e.g., line DQ of FIGS. 5A and 5B). During the transfer of the fixed number of words, the address and control buses (e.g., ADDR, CE, R/W, etc.) are generally available to other devices (e.g., portions 152, 156, and 160 of FIG. 5A; portions 152', 156', and 160' of FIG. 5B). In one example, the control and address bus activity may be one-fourth (FIG. 5A) or one-eighth (FIG. 5B) the data bus activity (e.g., compare line ADDR with line DQ of FIGS. 5A and 5B). The reduced bus activity may be an effect of the

Petitioner AMD Ex-1001, 0006

US 6,651,134 B1

5

6

architecture. The data bus may be, in one example, active nearly 100% of the time (e.g., line DQ of FIGS. **5A** and **5B**) In one example, there may be no inefficiencies switching from read to write to read etcetera (e.g., see labels under line DQ of FIGS. **5A** and **5B**).

Referring to FIG. **6**, a timing diagram illustrating a fixed burst length long enough to hide a writeback and a refresh cycle is shown. Internally the action being performed may completely hide DRAM refresh activity inside nominal external activities. A portion **162** illustrates that refresh activity (e.g., writeback, read for refresh, and writeback for refresh) may be completed within the time of the burst transfer. When a fixed burst long enough to completely hide refresh activity is provided, there may be no penalty for using DRAM instead of SRAM for the memory **104**.

While the invention has been particularly shown and described with reference to the preferred embodiments thereof, it will be understood by those skilled in the art that various changes in form and details may be made without departing from the spirit and scope of the invention.

What is claimed is:

1. A circuit comprising:
   a memory comprising a plurality of storage elements each configured to read and write data in response to an internal address signal; and
   a logic circuit configured to generate a predetermined number of said internal address signals in response to (i) an external address signal, (ii) a clock signal and (iii) one or more control signals, wherein said generation of said predetermined number of internal address signals is non-interruptible.

2. The circuit according to claim **1**, wherein said predetermined number of internal address signals is determined by a fixed burst length.

3. The circuit according to claim **1**, wherein said predetermined number of internal address signals is at least 4.

4. The circuit according to claim **1**, wherein said predetermined number of internal address signals is 8.

5. The circuit according to claim **2**, wherein said fixed burst length is programmable.

6. The circuit according to claim **5**, wherein said fixed burst length is programmed by bond options.

7. The circuit according to claim **5**, wherein said fixed burst length is programmed by voltage levels on external pins.

8. The circuit according to claim **1**, wherein said memory comprises a static random access memory.

9. The circuit according to claim **1**, wherein said memory comprises a dynamic random access memory.

10. The circuit according to claim **9**, wherein said predetermined number of internal address signals is chosen to provide time for at least one writeback or refresh cycle.

11. The circuit according to claim **1**, wherein said predetermined number of internal address signals is chosen to meet predetermined criteria for sharing address and control busses.

12. The circuit according to claim **1**, wherein said logic circuit comprises a counter configured to generate said predetermined number of internal address signals.

13. The circuit according to claim **1**, wherein said external address signal comprises an initial address for data transfers to and from said memory.

14. A memory device according to claim **1**, wherein said circuit is an integrated circuit.

15. The circuit according to claim **1**, further comprising address and control busses configured to present said external address signal and said one or more control signals, wherein said busses are freed up during the generation of said predetermined number of internal address signals.

16. A circuit comprising:
   means for reading data from and writing data to a plurality of storage elements in response to a plurality of internal address signals; and
   means for generating a predetermined number of said internal address signals in response to (i) an external address signal, (ii) a clock signal and (iii) one or more control signals, wherein said generation of said predetermined number of internal address signals is non-interruptible.

17. A method of providing a fixed burst length data transfer comprising the steps of:
   accessing a memory in response to a plurality of internal address signals; and
   generating a predetermined number of said internal address signals in response to (i) an external address signal, (ii) a clock signal and (iii) a control signal, wherein said generation of said predetermined number of internal address signals is non-interruptible.

18. The method according to claim **17**, further comprising the step of programming said predetermined number.

19. The method according to claim **18**, wherein said programming step is performed using bond options.

20. The method according to claim **18**, wherein said programming step is performed using voltage levels.

21. The method according to claim **17**, further comprising the step of selecting said predetermined number to provide time for at least one writeback or refresh cycle.

\* \* \* \* \*

Petitioner AMD Ex-1001, 0007

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 19, 2022, a true and correct copy of the foregoing was timely filed with the Clerk of the Court using the appellate CM/ECF system, which will send notifications to all counsel registered to receive electronic notices.

*/s/ Kayvan Noroozi*

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(f) and the Rules of this Court, because it contains 13,676 words (as determined by the Microsoft Word for Mac 2020 word-processing system used to prepare the brief), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) and the Rules of this Court because it has been prepared in a proportionally spaced typeface using the Microsoft Word for Mac 2020 word-processing system in 14-point Roman font.

*/s/ Kayvan Noroozi*